517 P.2d 1095

In the Matter of the APPEAL IN MARICOPA COUNTY, JUVENILE ACTION NO. JS–378.

No. 1 CA–JUV 12.

Court of Appeals of Arizona,
Division 1,
Department B.
Jan. 10, 1974.

Hendrickson & Gadzia, by William H. Gadzia, Mesa, for appellant.

Gary K. Nelson, Atty. Gen., by Harold J. Merkow and Michael Flam, Asst. Attys. Gen., Phoenix, for appellee.

## OPINION

JACOBSON, Chief Judge, Division 1.

This appeal by the natural mother from an order of the Maricopa County Juvenile Court severing her parental rights to her minor children raises the issue of whether the Department of Public Welfare (now Department of Economic Security) has met its burden of proof so as to justify the termination of the parent-child relationship.

The background facts in this case are as follows: On November 18, 1971, a dependency petition was filed in Maricopa County Juvenile Court alleging that the three minor children of appellant mother were dependent and neglected children because of the mother's mental illness.[1] As a result of this petition the juvenile court on January 28, 1972 found the children to be dependent and made them wards of the court and committed the care, custody and control of the children to the Maricopa County Department of Public Welfare. This dependency finding was reviewed on July 26, 1972 and again on October 11, 1972, and the juvenile court continued the dependency status of the minor children.

On October 24, 1972, the petition which is the subject matter of this appeal was filed seeking the termination of the parent-child relationship between appellant and her minor children on the grounds that the appellant was unable to discharge her parental responsibilities because of mental illness or mental deficiency and there existed reasonable grounds to believe that this condition would continue for a prolonged indeterminate period.[2] A hearing

1. At the time of this petition the whereabouts of the natural father was unknown. The natural father subsequently executed a consent to adoption and is not a party to these proceedings.

2. A.R.S. § 8–533 provides in part that:
   "Any person or agency . . . including, but not limited to . . . [the] department of welfare . . . may file a petition for the termination of the parent-child rela-

was not held on this petition until June 15, 1973 and a continued hearing was held on July 6, 1973. Following these hearings, the juvenile court on July 13, 1973, on findings of fact, entered its order terminating the parent-children relationship. This appeal followed.

The sole issue presented by this appeal is whether the evidence presented supports the juvenile court's findings that the natural mother is now and was at the time of filing the petition: (1) unable to discharge her parental responsibilities, (2) that this was because of a mental illness or a mental deficiency; and (3) that the mental condition will continue for a prolonged indeterminate period.

■ In reviewing this issue we first note that "The court's findings with respect to grounds for termination shall be based upon a preponderance of the evidence . . . ." A.R.S. § 8–537(B). We are also aware that findings of the trier of fact shall not be set aside unless they are clearly erroneous, that is, there is no reasonable evidence to support them. Ashley v. Kramer, 8 Ariz.App. 27, 442 P.2d 564 (1968).

The Department of Public Welfare attempted to meet its burden of proof as to the present mental condition of the appellant through three doctors. Dr. Lillian Weiss, a clinical psychologist employed by the Maricopa County Hospital, was called to testify. Dr. Weiss stated that she had seen the appellant as an out patient at the hospital nine times beginning in September, 1971 and that the last time she had observed her was in November, 1971. She testified that:

"Q. Dr. Weiss, do you feel qualified to testify as to the condition of [the mother] . . . ?

"A. No.

"Q. . . . this day? What is it? June 15, 1973?

"A. No, because I haven't been seeing her that regularly and I really haven't been responsible for her. She's been followed at St. Luke's."

Dr. Weiss did testify that as of November 18, 1971, she was of the opinion that the appellant was incapable of taking care of her children, but felt that to be sure on this point a home visit was necessary, as compared to office visits which was the only environment in which Dr. Weiss had interviewed the appellant. Dr. Weiss further testified that appellant's condition had improved when she saw her informally in June 1973, as compared to her condition in November, 1971. She testified:

"Q. Well, do you feel that with treatment and medication that she would be more relaxed and she would probably be more able to take care of herself and the children?

"A. Yes, yes.

"Q. Do you have any personal knowledge of how [the mother] has cared for her children in the home?

"A. I have never been in the home. I have never seen the children, no."

Dr. Moran Menendez, a psychiatrist on the staff at St. Luke's Hospital at the times pertinent to his testimony, was also called to testify. Dr. Menendez testified that he had no contact with the appellant since July, 1972. At that time he diagnosed appellant's condition as being mentally retarded and also suffering from chronic undifferentiated schizophrenia. He further testified that while traditional long term psychotherapy would not improve appellant's condition and that her intelligence limits could not be transcended, he did believe her schizophrenic condition

---

tionship if one or more of the following grounds exist:

\* \* \* \* \*

"3. That the parent is unable to discharge the parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period."

would respond to medication which he prescribed. He went on to state:

"Q. Would it be fair to say that if she did not take Melloril therapy she would revert to those symptoms you have just described?

"A. No, that wouldn't be fair. Very often a person has a psychiatric episode and there's a natural history of illness, will follow a course of remission so conceivably a year later she would be on no medication and not need it and not have regressed.

"Q. At some later time, if she was not on the medication, is it possible that the symptoms would reoccur?

"A. Yes, but, it would be very hard to predict distinctly what the odds would be.

\*      \*      \*      \*      \*      \*

"Q. You indicated based upon the history and the information available to you that with the type of treatment you have prescribed there would be a possibility of [the mother] getting to the point where she would function adequately but you declined to speculate as to the likelihood of that possibility occurring or to the degree to which this could occur, is that correct?

"A. Yes.

"Q. Now, I'm not sure whether you're talking about functioning adequately in terms of herself or functioning adequately in terms of the parent-child relationship, which did you have in mind? Or is there a difference?

"A. I think they would overlap. My feeling would be that [the mother] first, would initially function more adequately herself. Then when this was attained would then consider resuming her role as mother. I think one would tend to fall into the other.

"Q. I see. And you currently have no opinion as to the degree to which you think this would occur with the kind of therapy you prescribed?

"A. Correct. Because, again, the—I do not have—without seeking a record, a real detailed description of [the mother's] ability to function, we saw her briefly in a clinic setting. No, to my knowledge, no direct knowledge of how she functioned at home. Ideally, you would make home visits or a member of the psychiatric team would make home visits. People look different in a clinic than they do at home and see how she would be functioning there. Again, I think the specialities of the relationship between [the mother] and her sister would have to be explored, the relationship reviewed. But I think there is also the other side, apparently the sister did help support [the mother] through a very difficult period when she was psychotic. So there would be positive aspects of the relationship that you would utilize and I think without a really detailed intimate knowledge of these factors it would be very hard to make any predictions or any valid prognostic statement."

Finally, Dr. Menendez stated:

"Q. How competent do you feel you are testifying to her current condition without having any knowledge of what has transpired with her over a year?

"A. Not competent at all. I have no knowledge where Mrs. Bolstad is at currently."

This was the only medically oriented testimony presented to the court dealing with appellant's present condition. The appellee, recognizing the deficiencies in this testimony, states in its brief before this court:

"The state was able to establish that the natural mother was mentally ill and mentally deficient as of one year ago.

The state was also able to show that the natural mother's only contacts with the hospital were through the medicine clinic. The court *could infer* that since [the mother] was still receiving medication of the same type as was given to her upon her discharge from the hospital *that the diagnosis made while she was hospitalized remains valid.*

\* \* \* \* \* \*

"The court *could have inferred* from the testimony that since [the mother] had not in the past nor was currently receiving therapy except medication . . . *that the condition would continue for a prolonged indeterminate period of time.*"

■ In our opinion, in view of the medical testimony, neither this court nor the juvenile court could make such inferences which were vital to the proof of appellee's case.

We are constrained as an appellate court in cases of this type which, by their very nature, require the juvenile court to make decisions not only affecting the parties before it but also affecting directly the welfare and best interests of non-represented parties—the minor children—to lean over backwards to justify the decision of the trier of fact who is eminently more familiar with the background, attitudes, and conditions of all the parties than this court. This is especially true where, by the mere passage of time, relationships affected by that judicial decision have ripened and matured and the breaking of those new relationships may be more traumatic and more detrimental to the interest of the affected parties than the original severance.

■ However, the severance of the natural ties of birth should not be undertaken upon mere inferences which are not reasonably supported by the evidence. In our opinion, the record before this court in this case shows a complete lack of evidence to support the statutory prerequisite imposed by A.R.S. § 8–533(3) for the termination of the parent-child relationship. In making this determination we find, as a matter of law, that the appellee has failed to sustain its burden of proof.

For these reasons, the judgment of the juvenile court must be reversed and the matter remanded for a new hearing.

HAIRE, P. J., and EUBANK, J., concur.