NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

VICTORIA F., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY,[1] J.P., J.P., S.P., S.P., *Appellees*.

No. 1 CA-JV 14-0129
FILED 11-18-2014

Appeal from the Superior Court in Maricopa County
No.  JD17049
The Honorable Connie Contes, Judge

**AFFIRMED**

COUNSEL

The Stavris Law Firm, PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Holguin
*Counsel for Appellees*

---

[1] Pursuant to S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted), the Department of Child Safety (DCS) is substituted for the Arizona Department of Economic Security (ADES) in this matter.  *See* ARCAP 27.  For consistency, we refer to DCS in this decision even where, at the time, actions were taken by ADES.

---

## MEMORANDUM DECISION

Judge Kenton D. Jones delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Michael J. Brown joined.

---

**J O N E S**, Judge:

¶1            Victoria F. (Mother) appeals the trial court's order terminating her parental rights to the four oldest of her seven children, J.J.P., J.M.P., S.G.P., and S.M.P. (collectively, the Children), on the statutory grounds of fifteen months out-of-home care and Mother's chronic substance abuse.[2]  *See* Ariz. Rev. Stat. (A.R.S.) § 8-533(B)(3), (8).[3]  Because the Children are "Indian child[ren]," these proceedings are subject to the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901 to 1963.  *See* 25 U.S.C. § 1903(4) (defining "Indian child").   Mother contends DCS presented insufficient evidence to support (1) either of the statutory grounds for severance, (2) the trial court's finding that severance was in the Children's best interests, and (3) the required ICWA finding that Mother's continued custody would likely result in serious emotional or physical harm to the Children.  *See* 25 U.S.C. § 1912(f).  For the following reasons, we affirm.

### FACTS[4] AND PROCEDURAL HISTORY

#### A.     The 2008 Dependency Petition

¶2            This case originated in June 2008, when DCS filed a dependency petition as to the three oldest children, J.J.P., J.M.P., and S.G.P., after S.G.P. was born "substance exposed" to methamphetamine.  Mother

---

[2]      R.P. is the natural father of J.J.P., J.M.P., and S.G.P.  C.R. is the natural father of S.M.P.  Both R.P. and C.R.'s parental rights were also terminated as to the Children, however, neither is a party to this appeal.

[3]      Absent material revisions from the relevant date, we cite a statute's current version.

[4]      We view the facts in the light most favorable to upholding the termination order.  *See Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 449, ¶ 12, 153 P.3d 1074, 1078 (App. 2007) (citing *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 13, 53 P.3d 203, 207 (App. 2002)).

admitted using meth throughout her pregnancy, and as recently as two days before S.G.P.'s birth. DCS took temporary custody of the three children, placed them in foster care, and filed a dependency petition.

¶3         During the dependency, Mother was offered various services from DCS, including drug testing, parent aide services/supervised visitation, parenting classes, and transportation assistance. She was referred to TERROS for a substance abuse assessment in July 2008, but was unable to begin treatment because she was incarcerated for an armed robbery, committed after the three children were taken into DCS custody. Following her release, Mother received another referral to TERROS in May 2009, and followed through with the recommendation that she enroll in intensive outpatient substance abuse treatment. Mother successfully participated in all services, and eventually regained physical custody of the three children in November 2009. In January 2010, Mother gave birth to S.M.P., who remained in Mother's care. In February 2010, the dependency petition was dismissed.

### B.        The 2010 Dependency Petition

¶4         On August 9, 2010, DCS again took J.J.P., J.M.P., and S.G.P., into temporary custody and placed them in foster care after receiving a report that Mother and the Children were residing at a hotel, the Children were "filthy and bruised," and two were suffering from severe eczema on their arms and legs, causing their skin to become raw and bleed. DCS also took S.M.P. into temporary custody after Mother informed DCS the child was residing with her paternal aunt; DCS found S.M.P. was well taken care of and placed her back with her paternal aunt under a safety plan. At that time, Mother admitted to the DCS case worker she began using meth again in May 2010, and had last used two days prior. She also admitted using the per capita income received from her tribe, the Salt River Pima-Maricopa Indian Community (SRPMIC or the Tribe), to buy meth, rather than pay her rent.

¶5         DCS then filed another dependency petition, alleging Mother neglected the Children by abusing substances that impaired her ability to parent and by failing to provide them basic necessities of life. SRPMIC intervened in the dependency action. The trial court entered temporary orders making the Children temporary wards of the court, granting DCS legal custody, and placing the three oldest children in DCS's physical custody while placing S.M.P. in the physical custody of her paternal aunt. At that time, the case plan for the Children was family reunification.

¶6        DCS again began providing services to Mother; specifically, it submitted referrals for drug testing and substance abuse treatment, and offered her supervised visitation and parent aide services.  Mother did not initially participate in drug testing, and missed her first two intake appointments with TERROS.  In a September 2010 meeting at TERROS, she self-reported she was still using meth and had used marijuana recently as well.    Thereafter, she missed her third scheduled TERROS intake assessment, and her referral was closed in October 2010 for a lack of contact.  Between August and October 2010, Mother participated in one supervised visit with the Children, and missed three other scheduled visits.  In the middle of October 2010, Mother was again incarcerated, this time for criminal trespassing and violating her probation.

¶7        Upon her release in December 2010, DCS re-initiated services for Mother, re-submitting referrals for drug testing and substance abuse treatment, again offering parent aide services and supervised visitation, a psychological evaluation, and transportation assistance.    Following completion of her TERROS substance abuse assessment intake interview, at which she stated she first used meth when she was sixteen years old, Mother received an Axis I diagnosis of "Amphetamine or Related Acting Sympathomimetic Abuse," and was recommended to enroll in the Standard Outpatient Group.  She participated in drug testing, consistently providing negative tests.  She also participated in the TERROS Standard Outpatient Program, and regularly attended her weekly supervised visits with the Children.

¶8        The Children were adjudicated dependent in March 2011 at a contested dependency hearing.  At that hearing, DCS, with SRPMIC's approval, sought to have the Children's case plan changed to severance and adoption.  The trial court granted its request and in April 2011, DCS filed a motion to terminate Mother's parental rights to the three oldest children.  In the following months, Mother continued to progress through the offered services, graduating from the standard outpatient substance abuse treatment through TERROS, maintaining her sobriety as demonstrated by consistent negative urinalysis testing, and participating in appropriate, consistent supervised visits with the Children.  She also was able to secure subsidized housing on SRPMIC's reservation through its Young Adult Transitional Program.

¶9        In September 2011, given Mother's progress, DCS withdrew the severance petition.  On DCS's motion, the court then changed the case

plan for the three oldest children back to family reunification, and affirmed family reunification as S.M.P.'s case plan.[5]

¶10 In March 2012, DCS began transitioning the Children back into Mother's physical care, returning J.M.P. and S.M.P. first. To help with the transition, DCS provided Mother a family reunification team, which consisted of one therapist and one specialist who addressed parenting skills. The first reunification team was successfully closed out in May 2012, but because J.J.P and S.G.P. were also returned to Mother's physical care in April 2012, a second family reunification team was initiated. Thereafter, Mother successfully completed all ten weekly visits with the second reunification team, which in late August 2012 was preparing to close the referral as a success. Other than a single diluted drug test in April 2012, Mother had continued to provide negative drug tests. At this juncture, DCS was preparing to dismiss the second dependency petition.

### C. The 2012 Developments

¶11 Unfortunately, things began to unravel the next month. On September 11, 2012, DCS requested Mother visit the DCS office to discuss a report it had received alleging "substance abuse, physical abuse, domestic violence and unsafe individuals in the home." But she did not comply with the request and would not disclose her or the Children's whereabouts, other than to reveal she was in the Phoenix area. After this initial contact, Mother did not answer her phone and DCS was unable to re-establish contact with her. It was later revealed Mother had been evicted from her housing in mid-September 2012 for fighting on the premises. When she left, she refused to inform SRPMIC where she was relocating with the Children. Therefore, on September 17, 2012, DCS filed a motion for pickup of the Children. On October 1, 2012, Mother surrendered the Children through their paternal grandmother to a SRPMIC case worker, and shortly thereafter, the court transferred physical custody of the Children back to DCS.

¶12 Shortly after the Children's return to DCS, Mother submitted to a hair follicle drug screen, which was positive for amphetamine and

---

[5] In November 2011, Mother gave birth to her fifth child. That child is not a party to this appeal.

methamphetamine use.[6]   Although Mother claimed she only used on the day the Children were surrendered to DCS, the amount of meth found in her hair was indicative of daily use over a significant period of time.

¶13         Following the positive test, DCS re-engaged services for Mother for the third time.  It again referred Mother for substance abuse treatment, random drug testing, parent aide services/supervised visitation, and transportation assistance.  Mother completed her TERROS substance abuse intake assessment in November 2012, and was enrolled in the Standard Outpatient Program, again, based upon her self-reported recent meth use.  She completed the outpatient program in March 2013, and enrolled in an aftercare program through TERROS as well.  Mother also participated in a Women in Recovery course.

¶14         That same month, Mother underwent a psychological evaluation with Dr. James Thal.  He found Mother was well-intentioned in her desire to parent the Children, but had "under-developed parenting skills," which was the foundation for his opinion that "it would be extremely difficult for [Mother] to resume care of all of her children, given her history" and lack of suitable housing, but found Mother could potentially care for "one or perhaps two of her children."

### D.      2013 Severance Proceedings

¶15         Although Mother was participating in the reunification services offered by DCS, the case plan for the Children was changed to severance and adoption, and, in April 2013, DCS filed a petition to sever Mother's parental rights on the grounds of chronic history of substance abuse and fifteen months in out-of-home care.[7]   A six-day contested severance hearing was held over several months spanning from October

---

[6]     At the time of the test, Mother was pregnant with her sixth child. The child was later born meth exposed in March 2013.  DCS filed a dependency petition as to this child, and SRPMIC assumed jurisdiction of the proceedings; therefore, the sixth child is not a party to this case.

[7]     In September 2013, DCS filed an amended petition to correct several names within the original petition.

2013 to January 2014. In the meantime, Mother continued to consistently participate in the treatment services offered by DCS.[8]

¶16        At the severance hearing, Dr. Glenn Moe, a psychologist who performed a bonding and best interest assessment regarding Mother and the Children, testified the Children had an attachment to Mother, but the primary consideration in determining the Children's best interests is Mother's ability, or lack thereof, to consistently, over an extended period of time, meet the Children's needs. He noted caring for seven children is undoubtedly stressful, and that Mother told him she reverts to drug use when faced with periods of stress. Given Mother's history with drugs, Dr. Moe opined that she faced a high risk of relapsing if the Children were returned to her, and stated his opinion was not affected by Mother's current progress with services because the services had been unsuccessful in preventing relapse in the past.

¶17        In April 2014, the trial court entered an order severing Mother's parental rights to the Children. Mother timely appealed. We have jurisdiction pursuant to A.R.S. §§ 8-235(A) and 12-1201(A)(1).

## DISCUSSION

¶18        A trial court may only terminate a parent's parental rights if it finds a statutory ground for severance exists by clear and convincing evidence, and also finds, by a preponderance of the evidence, severance is in the child's best interests. A.R.S. §§ 8-533(B), -537(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41, 110 P.3d 1013, 1022 (2005); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248-49, ¶ 12, 995 P.2d 682, 684-85 (2000). We do not reweigh the evidence on appeal; rather, we determine only whether any reasonable evidence supports the trial court's findings. *See Michael J.*, 196 Ariz. at 250, ¶ 20, 995 P.2d at 686. We will not disturb a severance order unless it is based upon clearly erroneous factual findings, or stated otherwise, "unless there is no reasonable evidence to support" the court's factual findings. *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 2, 982 P.2d 1290, 1291 (App. 1998) (citing *Maricopa Cnty. Juv. Action No. JS-4374*, 137 Ariz. 19, 667 P.2d 1345 (App. 1983), and *Maricopa Cnty. Juv. Action No. JS-378*, 21 Ariz. App. 202, 204, 517 P.2d 1095, 1097 (1974)).

¶19        Where ICWA is implicated, the trial court must address two additional substantive requirements beyond the statutory grounds and best

---

[8]        Also during this time, Mother informed DCS that she was pregnant with her seventh child, who is not a party to this case.

interest of the child: (1) whether active efforts were made to provide services to prevent the breakup of the Indian family; and (2) whether proof beyond a reasonable doubt exists that a parent's continued custody will likely result in serious physical or emotional damage to the child. *See* 25 U.S.C. § 1912(d), (f). ICWA does not require, however, the "beyond a reasonable doubt" standard of proof be applied to the state-law findings. *Valerie M. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 335, ¶ 20, 198 P.3d 1203, 1207 (2009).

## I.     State Law Grounds for Severance

### A.     Chronic Substance Abuse

**¶20**     A parent's parental rights may be terminated if "the parent is unable to discharge parental responsibilities because of . . . a history of chronic abuse of dangerous drugs, controlled substances or alcohol and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." A.R.S. § 8-533(B)(3); *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 377, ¶ 15, 231 P.3d 377, 381 (App. 2010). Additionally, there is an "implicit requirement," when establishing substance abuse as grounds for termination of parental rights, "that the condition from which the parent suffers be proven not to be amenable[9] to rehabilitative services." *Jennifer G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 450, 453 n.3, ¶ 12, 123 P.3d 186, 189 n.3 (App. 2005) (internal quotation omitted) (citing *Steven K. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 483, 490, ¶ 24, 113 P.3d 1240, 1247 (App. 2005), and *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 191, ¶ 31, 971 P.2d 1046, 1052 (App. 1999)).

**¶21**     Mother does not challenge the sufficiency of the evidence illustrating she suffers from chronic substance abuse that will likely continue for a prolonged indeterminate period, or that her substance abuse rendered her unable to discharge parental responsibilities. Rather, relying exclusively on *Jennifer G.*, Mother contends only that her "continued and consistent negative drugs screens as well as her successful completion of [TERROS substance abuse treatment]" demonstrate she is amenable to rehabilitative services, and therefore the court erred in finding DCS had proven this ground for severance. But, Mother's contention is not supported by the record; to the contrary, the evidence presented established

---

9     "Amenable" means "responsive." The New Lexicon Webster's Encyclopedic Dictionary 28 (Deluxe ed. 1990).

that Mother's chronic substance abuse has not been amenable to the many rehabilitative services she has received from DCS.

¶22      Mother began using meth at an early age, reporting her first use at age sixteen. The first dependency case (the 2008 dependency) originated when Mother's third child was born substance exposed to meth. According to the DCS progress reports and TERROS records, Mother completed an outpatient substance abuse program in December 2009, which prompted the return of the Children to her care. During that period, she was also able to demonstrate sobriety through random urinalysis testing. However, Mother relapsed only three months after the first dependency petition was dismissed, prompting DCS, in part, to take the Children back into its care and initiate a second dependency case (the 2010 dependency). Again Mother was able to participate in and complete a variety of substance abuse services, including another TERROS substance abuse program, leading to her regaining physical custody of the Children. However, once Mother regained physical custody, she immediately submitted a diluted urinalysis test (which is viewed as a positive test), and several months later relapsed again, during another of her pregnancies, prompting DCS to re-assume physical custody a third time, and pursue severance of Mother's parental rights.

¶23      Mother's actions over the past six years demonstrate a chronic history of substance abuse, which has not been amenable to rehabilitative services. Chronic abuse has been defined as abuse that is "long-continued, lingering, and inveterate." *Raymond F.*, 224 Ariz. at 377, ¶ 16, 231 P.3d at 381 (citing Oxford English Dictionary 409 (Compact ed. 1971)). Although Mother argues, by implication, her condition is amenable because she has provided only one positive drug test since the second dependency case began — the October 2012 positive hair follicle test — "drug abuse need not be constant to be considered chronic." *Id.* The focus is not on the number of positive or negative drug tests, "but rather, [whether she] has consistently failed to *abstain* from drugs . . . ." *Id.* at 379, ¶ 29, 231 P.3d at 383 (emphasis in original). The record demonstrates Mother "has been unable to rise above [her] addiction in a non-custodial and unstructured setting, similar to that in which a [mother] would be expected to raise [her] children." *Id.*

¶24      Furthermore, Mother misconstrues the object that must be "proven not to be amenable to rehabilitative services." She argues she is now participating in and completing rehabilitative services, and therefore *she* is amenable, or responsive, to rehabilitative services. However, it is not the individual who must be amenable to rehabilitative services, but the

individual's *condition*. *Jennifer G.*, 211 Ariz. at 453 n.3, ¶ 12, 123 P.3d at 189 n.3.

**¶25**      We agree Mother has been able to complete substance abuse services, as exhibited by her three separate graduations from TERROS substance abuse treatment programs.      But while attendance and participation in treatment are laudable, and undoubtedly necessary components of rehabilitation, Dr. Moe testified at the severance hearing that "participation [in services] is not enough" to demonstrate a successful completion of services; rather, "[s]uccess is measured . . . in being able to transfer [the knowledge and experience from treatment] to [a person's] life."   Although Mother has demonstrated being capable of participating consistently in substance abuse services, she has failed to demonstrate that her *condition* has been amenable, or responsive, to those services.   Even though she submitted negative drug tests from October 2012 until January 2014, she has previously maintained sobriety for a lengthier period, only to relapse when the structure provided by DCS was removed.   In such cases, "'[t]he interests in permanency for [the Children] must prevail over [Mother's] uncertain battle with drugs.'" *Id.* (quoting *In re N.F.*, 579 N.W.2d 338, 341 (Iowa App. 1998)).

**¶26**      The evidence was sufficient for the court to find Mother's chronic substance abuse would persist, and continue to negatively affect her parenting skills, for a prolonged, indeterminate period.[10]

### B.      The Children's Best Interests

**¶27**      Mother also argues insufficient evidence supports the trial court's finding that severance of Mother's parental rights was in the Children's best interests.   To sever a parent-child relationship, the trial court must find by a preponderance of the evidence that severance is in the child's best interests.   *Kent K.*, 210 Ariz. at 288, ¶ 41, 110 P.3d at 1022.   Severance is in the child's best interest if the child would derive a benefit from severance or be harmed by continuation of the parent-child relationship.   *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5-6, 804 P.2d 730, 734-35 (1990).

---

[10]      "If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds." *Jesus M.*, 203 Ariz. at 280, ¶ 3, 53 P.3d at 205 (citing *Michael J.*, 196 Ariz. at 251, ¶ 27, 995 P.2d at 687; *Maricopa Cnty. Juv. Action No. JS-6520*, 157 Ariz. 238, 242, 756 P.2d 335, 339 (App. 1998)).   Accordingly, we need not reach whether sufficient evidence also supported severance on the ground of fifteen months out-of-home care.

Factors supporting a finding that the child will benefit from a severance of a parent-child relationship include the "immediate availability of an adoptive placement," *Audra T.*, 194 Ariz. at 377, 982 P.2d at 1291 (citing *Pima Cnty. Juv. Action No. S-2460*, 162 Ariz. 156, 158, 781 P.2d 634, 636 (App. 1989)), the existing placement is meeting the child's needs, *id.* (citing *Maricopa Cnty. Juv. Action No. JS-8490*, 179 Ariz. 102, 107, 876 P.2d 1137, 1142 (1994)), and the adoptability of the child. *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352, 884 P.2d 234, 238 (App. 1994) (citing *Yavapai Cnty. Juv. Action No. J-9956*, 169 Ariz. 178, 180, 818 P.2d 163, 165 (App. 1991), and *JS-6520*, 157 Ariz. at 243-44, 756 P.2d at 340-41).

**¶28**     The trial court's finding that severance was in the Children's best interests is sufficiently supported by the record. The DCS case manager testified the Children were adoptable, and each of their respective placements were willing to adopt. The tribal case worker echoed this testimony, with the exception that SRPMIC had not yet made a decision on whether it agreed with J.J.P.'s prospective adoptive placement. Nonetheless, even if the Tribe ultimately objects to J.J.P.'s adoption by that particular placement, the tribal case worker testified he was an adoptable child. Moreover, the DCS case manager testified each child's placement was able to meet his or her needs. Further, both the DCS case manager and Dr. Moe testified severance would allow the Children to benefit from having permanency and stability in their lives. Accordingly, the trial court did not abuse its discretion in finding, by a preponderance of the evidence, that severance was in the Children's best interests.

## II.     ICWA Findings

**¶29**     ICWA "requires a state court to make two particular findings before terminating the parental rights for an Indian child." *Valerie M.*, 219 Ariz. at 333, ¶ 3, 198 P.3d at 1205. First, the court must find "'active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.'" *Id.* (quoting 25 U.S.C. § 1912(d)). Second, the court must make "'a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.'" *Id.* (quoting 25 U.S.C. § 1912(f)). The trial court made both findings in this case. Because Mother does not contest the court's "active efforts" finding, we focus only upon whether evidence supports the second ICWA finding.

¶30        Here, Dr. Moe, a psychologist contracted to provide psychological evaluations for SRPMIC, opined that Mother faced a high risk of relapse based upon her history of recidivism, the lack of support system in her life, and her reversion to drug use when faced with stressful events.   He also opined that because of Mother's high risk for relapse, it was likely the Children would be neglected if returned to Mother's care, which would cause behavioral issues, anxiety, and a reduction of trust.  The Children displayed several such behavioral issues when they came into care in 2012, such as temper tantrums and food hoarding, which they have made progress addressing.   However, Dr. Moe opined there would be a high likelihood of regression if the Children faced another unsuccessful reunification with Mother, as well as it "likely creat[ing] insecurity for them and a host of other potential issues ranging from anxiety to depressive reactions to behavioral reactions."   Dr. Moe appreciated that Mother was well-intentioned with her desire to parent all seven of her children, but ultimately concluded she lacked the parenting skills to effectively parent "this large number of children and . . . certainly raise them on a 24/7 basis."

¶31        The ICWA coordinator for SRPMIC social services testified that she did not believe Mother had fully addressed her substance abuse issue and faced a risk of relapse.  She opined that the Children would face a risk of physical or emotional damage if returned to Mother's custody because of Mother's relapse history and continued risk of relapse, and Mother's inability to maintain a stable life for any significant time without DCS involvement.

¶32        The DCS case manager, who has worked exclusively with Native American families in DCS's ICWA unit, also testified that Mother's history of substance abuse prevented her from currently parenting Children because she is still at risk of relapse and has not developed the skills to effectively address that issue.  She based her conclusion upon Mother's continual completion of services and substance abuse treatment only to fail to utilize the skills those services are designed to impart.  Based upon her review of the case file, her interactions with Mother, and the efforts taken previously by the Tribe, the DCS case manager opined that the continued custody of Children by Mother would likely result in serious emotional or physical damage to them.

¶33        We conclude this testimony, combined with the other evidence presented at the hearing, constituted a sufficient basis for the trial court's finding that returning the Children to Mother's custody "is likely to result in serious emotional or physical damage to the child[ren]."  25 U.S.C. § 1912(f).

**CONCLUSION**

¶34 For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: gsh