NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

KIMBERLY H., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, S.B., C.B., *Appellees*.

No. 1 CA-JV 14-0192
FILED 4-14-2015

---

Appeal from the Superior Court in Maricopa County
No. JD21231
The Honorable Linda H. Miles, Judge

**AFFIRMED**

---

COUNSEL

Denise L. Carroll, Scottsdale
By Denise L. Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Dawn R. Williams
*Counsel for Appellee Department of Child Safety*

## MEMORANDUM DECISION

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Kent E. Cattani and Judge Peter B. Swann joined.

**W I N T H R O P**, Judge:

**¶1**        Kimberly H. ("Mother") appeals the juvenile court's order severing her parental rights to S.B. and C.B. (collectively, "the children"). Because reasonable evidence supports severance based on cumulative out-of-home placement for fifteen months or more pursuant to court order, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**        S.B. was born in July 2010, and C.B. in July 2011.  In March 2011, the Department of Child Safety ("DCS")[1] began receiving reports about the family, primarily concerning allegations Mother and the children's alleged biological father ("Father")[2] were neglecting S.B. and engaging in domestic violence.  After police responded to a domestic violence incident in August 2011, Mother left Father and resided briefly with her mother until being asked to leave.  She subsequently resided with friends, but eventually relocated to a shelter. After further reports of neglect, DCS removed the children in December 2011.  At the time of removal, both children appeared emaciated, ill, and developmentally delayed, with ongoing medical conditions.  S.B. had a severe rash and open wounds from eczema, and C.B. had rotovirus and recurring ear infections.

---

[1]        At the outset of this proceeding, the children were taken into care by Child Protective Services ("CPS"), formerly a division of the Arizona Department of Economic Security ("ADES"), and ADES filed the initial dependency petition.  In May 2014, CPS was removed as an entity within ADES and replaced by DCS, an entity outside of ADES. *See* 2014 Ariz. Sess. Laws, ch. 1, §§ 6, 20, 54 (2d Spec. Sess.).  Accordingly, DCS has been substituted for ADES in this matter. *See* ARCAP 27.  References to DCS encompass both ADES and the former CPS.

[2]        On June 20, 2013, the juvenile court terminated Father's parental rights, as well as those of "John Doe" or any other person claiming paternity.  Father is not part of this appeal.

Mother appeared indifferent to concerns about the children and her lack of care for them. At the first visit between Mother and the children after their removal, it was apparent she had trouble supervising both children at the same time.

¶3         On December 29, 2011, DCS petitioned the juvenile court to declare S.B. and C.B. dependent as to both parents. As to Mother, DCS alleged the children were dependent due to abuse and/or neglect. Specifically, DCS alleged (1) Mother had failed to provide the children with the basic necessities of life, including their medical needs, as exhibited by Mother's failure to care for S.B.'s eczema and failure to obtain immunizations for the children, and (2) Mother and Father had domestic violence issues. On April 30, 2012, the juvenile court adjudicated the children dependent, and ordered a case plan of family reunification concurrent with severance and adoption.

¶4         To work toward reunification, Mother was expected to demonstrate an ability to (1) "recognize and seek medical attention for her children when needed," (2) "empathize with her children, recognizing their cues and appropriately respond[ing] to their needs," and (3) "financially provide a safe stable home." To help Mother achieve those goals, DCS provided her with transportation and arranged for her to complete a substance abuse assessment, urinalysis testing, and a psychological evaluation, and DCS offered other services, including parent aide assistance and individual counseling to address Mother's anger and domestic violence issues. DCS also completed assessments on the children and offered speech and other therapy for S.B. and occupational therapy for C.B. to address their developmental delays. DCS also offered day care, play therapy, and foster care services.

¶5         Despite the assistance DCS offered, Mother continued to struggle. She was unable to maintain stable housing or employment, and appeared to lack the motivation to participate in services to address the safety threats to the children. She also lacked insight into her involvement with DCS and the reasons the children remained in out-of-home placement. Mother minimized the allegations, lacked insight into normal child development, and indicated she wished to reunite with Father, despite their history of domestic violence. Mother was also inconsistent both in her drug testing - missing several required tests, testing positive twice for opiates in

July 2012,[3] and testing positive once for alcohol – and in her participation with parent aide services, missing several scheduled visits and resisting instruction from parent aides. During visits, she failed to appropriately supervise the children, used inappropriate language, argued with the parent aide, and refused to accept redirection in her parenting skills. She also demonstrated an inability to understand the importance of following the children's dietary restrictions, even after learning about S.B.'s extreme food allergies.

¶6            On October 22, 2012, DCS moved to terminate the parents' parental rights to the children. As to Mother, DCS sought to terminate her parental rights pursuant to Arizona Revised Statutes section 8-533(B)(8)(b) (West 2015)[4] (six months' time-in-care), alleging she had substantially neglected or willfully refused to remedy the circumstances causing the children to be in an out-of-home placement. DCS noted Mother had not been fully compliant with drug testing, individual counseling, domestic violence counseling, or visitation. At the conclusion of the trial on May 9, 2013, the juvenile court severed Father's parental rights; however, the court found DCS had failed to establish by clear and convincing evidence the grounds to terminate Mother's parental rights, and ordered the case plan changed to family reunification concurrent with severance and adoption.

¶7            DCS thereafter continued to offer reunification services to Mother, although DCS discontinued parent aide services and offered only case aide services for approximately one year. Mother remained inconsistent in her drug testing, missing numerous tests. Further, although Mother's parenting skills improved slightly between 2013 and 2014 and she was eventually able to verbalize some good parenting techniques, case aides continued to express concerns about Mother's ability to parent, and noted Mother consistently demonstrated an unwillingness or inability to learn and apply appropriate parenting skills. Mother sporadically missed visits and failed to adequately supervise both children, which resulted in safety concerns for the children. Despite one-on-one, hands-on parenting instruction from the case aides, Mother continued to put the children at risk by giving them food without ensuring it would not cause an allergic

---

[3]     Mother later provided a prescription to explain her positive tests for opiates.

[4]     We cite the current version of the applicable statutes because no changes material to our decision have occurred since the time of the severance.

4

reaction; allowed them to hurt themselves and each other without redirection; let S.B. cover himself in feces; and became upset with the children and case aides when the children would not listen to her. Mother also continued to minimize and deny the allegations and issues causing the children to be in out-of-home placement. Her housing and employment continued to be unstable, and she regularly missed individual counseling sessions.[5]

¶8        On October 9, 2013, DCS again moved to terminate Mother's parental rights to the children, on the grounds of six, nine, and fifteen months' time-in-care. *See* A.R.S. § 8-533(B)(8)(a)-(c). DCS further alleged that terminating Mother's parental rights was in the children's best interest.

¶9        Pending trial on the severance motion, Mother gave birth to a third child, A.H. Although Mother became more compliant with visitation and the services offered her, she continued to lack the necessary skills to safely parent, denied any parenting issues, and refused to accept direction with respect to her care of A.H. Accordingly, DCS removed A.H. from Mother's care as well. In January 2014, DCS filed a dependency petition regarding A.H.[6]

¶10        On February 12 and March 17, 2014, Mother completed a psychological evaluation offered by DCS and conducted by James Thal, Ph.D.[7] Dr. Thal diagnosed Mother with an unspecified personality disorder with borderline traits, and noted "she has a strong inclination to project blame onto others." Dr. Thal indicated his review of DCS reports supported his "genuine concern that [Mother] would quickly be overwhelmed by the demands of parenting three active children, all under the age of four." At the time of the evaluation, Mother was temporarily living in the apartment of two friends, but planned to move again in the near future, and had only recently secured a part-time job cleaning houses. Nevertheless, she asserted she could support herself and her three children, and she denied that her

---

[5]        Mother did, however, successfully complete of a counseling session in November 2013.

[6]        The juvenile court later adjudicated A.H. dependent as to Mother, but he is not subject to the termination order from which Mother appeals.

[7]        Mother was scheduled for her evaluation on February 12, but she arrived forty minutes early and indicated she would have to leave before the assessment could be completed. She missed the rescheduled March 3 appointment, then arrived late for the rescheduled March 17 appointment.

personal shortcomings had led to the children's out-of-home placement. Dr. Thal opined that Mother's general distrust of others and the absence of meaningful support from others would likely continue to hamper her. These traits were intertwined with her personality disorder, leading Dr. Thal to offer an uncertain prognosis regarding whether Mother would be "able to demonstrate minimally adequate parenting skills in the foreseeable future, even with existing or proposed interventions." Further, her inability to gain appropriate parenting skills in the time since the children's removal indicated her condition would continue "for a prolonged, indeterminate period of time," and a child in her care was at risk of neglect.

¶11 In April and June 2014, the juvenile court held a four-day contested severance hearing. At the beginning of the hearing, DCS withdrew the six-month and nine-month out-of-home placement grounds, and proceeded on the fifteen-month ground.

¶12 At the hearing, Dr. Thal opined that Mother would not be able to safely parent the children for at least "a couple of years," and that she would only be able to do so if she completed the "arduous" work necessary to address her own immaturity and personality disorder. He further noted that, "what's really difficult and really troubling is why she was never able to consistently implement what she learned" given the "hours and hours and hours of coaching" she received. He opined that reunification with S.B. and C.B. was "a lost cause," and Mother and DCS should focus their efforts on her new infant, A.H.

¶13 Similarly, Mother's DCS case manager, Ashley Shaub-Betcher, opined that Mother "has not been able to make significant behavior changes in two and a half years of [DCS] involvement," and therefore recommended discontinuing reunification services for S.B. and C.B.[8] When Ms. Shaub-Betcher supervised visits between Mother and the children following A.H.'s birth, she noted Mother continued to struggle to parent both S.B. and C.B., did not fully understand S.B.'s severe allergies, and required intervention because of safety concerns when she failed to adequately supervise the children. Moreover, Mother still had not demonstrated an ability to maintain a stable home or income and relied on DCS to meet her transportation needs. Her instability was particularly concerning, given the number of appointments and services the children needed on a regular basis. Because, unlike S.B. and C.B., A.H. had no

---

[8] Ms. Shaub-Betcher conceded, however, that sometime in the fall of 2013, Mother started submitting to drug testing more consistently and appeared to have remedied her substance abuse problem.

apparent special needs, Ms. Shaub-Betcher recommended Mother concentrate on obtaining the parenting skills necessary to parent him.

¶14        At the conclusion of the trial, the juvenile court terminated the parent-child relationship between Mother and the children. We have jurisdiction over Appellant's timely appeal pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## ANALYSIS

### I.        *Fifteen Months' Out-of-Home Placement*

¶15        Mother argues the juvenile court erred in finding there was clear and convincing evidence that she failed to remedy the circumstances that caused the children to be in out-of-home placement. We disagree.

¶16        Although the right to custody of one's children is fundamental, it is not absolute. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11–12, 995 P.2d 682, 684 (2000). The juvenile court may sever a parental relationship based on clear and convincing evidence of at least one statutory ground enumerated in A.R.S. § 8–533(B). *Id.* at 249, ¶ 12, 995 P.2d at 685. In addition, the court must find by a preponderance of the evidence that termination is in the best interest of the child. *See id.*; *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22, 110 P.3d 1013, 1018 (2005).

¶17        Because "the juvenile court [i]s in the best position to weigh the evidence, judge the credibility of the parties, observe the parties, and make appropriate factual findings," *Pima Cnty. Dependency Action No. 93511*, 154 Ariz. 543, 546, 744 P.2d 455, 458 (App. 1987), this court will not reweigh the evidence but will look only to determine if there is evidence to sustain the court's ruling. *Maricopa Cnty. Juv. Action No. JV–132905*, 186 Ariz. 607, 609, 925 P.2d 748, 750 (App. 1996). "We will not disturb the juvenile court's disposition absent an abuse of discretion or unless the court's findings of fact were clearly erroneous, i.e., there is no reasonable evidence to support them." *Id.* (citations omitted); *accord Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 78–79, ¶ 9, 41 P.3d 614, 616–17 (App. 2001).

¶18        Although DCS must provide parents with the time and opportunity to participate in programs designed to improve their ability to care for their child, *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 37, 971 P.2d 1046, 1053 (App. 1999), DCS is not required to provide every conceivable service or to ensure parents participate in each service offered. *Maricopa Cnty. Juv. Action No. JS–501904*, 180 Ariz. 348, 353, 884 P.2d 234, 239 (App. 1994). Nor is DCS required to offer futile services. *See*

*Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 50, ¶ 18, 83 P.3d 43, 50 (App. 2004).

### A.   Mother's Inability to Remedy the Circumstances

**¶19**        Mother argues "the State failed to prove that she was unable to remedy the circumstances that had caused the removal of her children" because she addressed her substance abuse and domestic violence issues, consistently visited the children, improved her parenting skills, and purportedly learned to use an EpiPen to treat S.B.'s allergies. Mother's argument, however, amounts to a request to reweigh the evidence, which we will not do. *See JV–132905*, 186 Ariz. at 609, 925 P.2d at 750. Mother's claim fails because, despite her efforts, she was unable to remedy the circumstances that caused the children's out-of-home placement.

**¶20**        Under A.R.S. § 8–533(B)(8)(c), the juvenile court had discretion to terminate Mother's parental rights after finding that (1) DCS made diligent efforts to provide appropriate reunification services; (2) the children were in an out-of-home placement for fifteen months or longer; (3) Mother was unable to remedy the circumstances causing the out-of-home placement; (4) a "substantial likelihood" existed Mother would "not be capable of exercising proper and effective parental care and control in the near future"; and (5) severance was in the children's best interest.[9] Unlike the nine-month ground under A.R.S. § 8-533(B)(8)(a), the fifteen-month ground under subsection (c) does not require that the juvenile court find the parent substantially neglected or wilfully refused to remedy the circumstances causing the out-of-home placement. Rather, it requires only that the juvenile court find the parent was unable to remedy the circumstances causing the out-of-home placement, regardless of her efforts. *See* A.R.S. § 8-533(B)(8)(c).

**¶21**        In this case, ample evidence supported the juvenile court's finding that Mother had been unable to remedy the circumstances that caused the children's out-of-home placement. Dr. Thal testified he diagnosed Mother with a personality disorder characterized by "self-defeating behaviors" and a pattern of making decisions that were not in her or her children's best interest. He opined that a personality disorder like Mother's would interfere with productivity and relationships (including the parent-child relationship) and would cause distorted thinking,

---

[9]        Mother has not challenged the juvenile court's findings that DCS made diligent reunification efforts and the children had been in an out-of-home placement for at least fifteen months.

difficulty accepting reality, and a tendency to blame others. Dr. Thal recognized Mother had made gains and had some favorable traits: she was young and potentially able to learn better habits, she was intelligent, and she had stopped using drugs. Nevertheless, he opined that overcoming her deficits would be "an arduous task[,] to say the least," and she would need "a considerable amount of time to catch up" with her own development before she would be able to parent. Dr. Thal's review of the records supported his opinion that Mother had made some progress, yet continued to display the same issues and deficits throughout the case and was not currently able to effectively parent.

¶22 Ms. Shaub-Betcher supported Dr. Thal's opinion. Following A.H.'s birth in January 2014, Ms. Shaub-Betcher opined Mother was not able to care for him because Mother "consistently demonstrates an unwillingness or inability to learn appropriate parenting skills, which would put her young infant at risk of abuse or neglect." She noted Mother "has been offered numerous services to remedy [her history of unsafe and limited parenting skills] in the past three years and she has not been able to consistently demonstrate good parenting skills." In fact, as recently as two months before trial, Mother still did not understand S.B.'s severe allergies. Ms. Shaub-Betcher noted that, in addition to Mother's deficient parenting skills, she still lacked stable income, housing, and transportation – all major concerns for her ability to safely care for the children. Ms. Shaub-Betcher opined that, as of June 2014, Mother was not able to parent any of her three children in a minimally adequate manner.

¶23 Mother's parent aides confirmed Mother struggled with caring for the children at visits, did not understand the children's developmental levels, was unable to understand and properly respond to the children's emotional cues, and was unable to consistently implement successful parenting skills. Further, Mother did not seem to understand the scope and implications of S.B.'s many allergies, bringing him snacks that could or did harm him, and Mother was incapable of adequately supervising both children at the same time, putting them at risk.

¶24 Thus, despite over two years of reunification services, including multiple referrals for various forms of parenting instruction, Mother remained unable to understand and address the children's special needs, could not safely parent them together, was unable to appropriately discipline them, and was unlikely to be able to overcome her challenges without years of arduous and ongoing work. Reasonable evidence supports the juvenile court's finding that Mother had been unable to

remedy the circumstances that caused the children's fifteen-month out-of-home placement.

### B. Mother's Inability to Exercise Proper and Effective Parental Care and Control in the Near Future

**¶25** Mother also claims DCS did not prove there was a substantial likelihood she would be unable to parent the children in the near future because "she is at the least, a minimally adequate parent pursuant to the statutes." She requests that this court reweigh the fact that she "currently has stable housing" and employment and "had actively engaged in services" against DCS's evidence that her immaturity and inability to consistently practice safe parenting rendered her unable to parent in the near future. As we have noted, we do not reweigh the evidence. *See JV–132905*, 186 Ariz. at 609, 925 P.2d at 750. Further, because reasonable evidence supports the juvenile court's finding that Mother would be unable to parent the children in the near future, her claim fails.

**¶26** In 1986, the Arizona Legislature amended A.R.S. § 8-533 to include out-of-home placement as a ground for severance to expedite the adoption of children in foster care and to promote a stable and long-term family environment for these children. *Maricopa Cnty. Juv. Action No. JS-6520*, 157 Ariz. 238, 243, 756 P.2d 335, 340 (App. 1988) (citation omitted). Termination under A.R.S. § 8-533(B)(8)(c) requires a showing that a parent is unable to properly and effectively parent a child "in the near future." Although the legislature did not define the phrase "near future," we construe undefined phrases contained in statutes according to their ordinary meaning. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 377, ¶ 16, 231 P.3d 377, 381 (App. 2010) (citation omitted). "Near" is defined in part as "at, within, or to a short distance or time" or "not far distant in time." Merriam-Webster's Collegiate Dictionary 775 (10th ed. 1993). Ultimately, the statute reinforces the concept that children should not be forced to wait inordinately for a parent to develop necessary parenting skills. *Raymond F.*, 224 Ariz. at 378, ¶ 25, 231 P.3d at 382.

**¶27** As detailed above, Mother's defensive and resistant posture rendered her unable to parent the children in the foreseeable future. Dr. Thal referenced Mother's decision to have a third child with yet another unsupportive and inappropriate man during the dependency, her view that she was a "great mom" despite the service providers' ongoing concerns, her inadequate income, and her immaturity for her age as reasons why it would take at least "a couple of years" before the children could be safely returned to her care. Supporting Dr. Thal's opinion, Mother's parent aide testified

Mother had failed to make adequate, consistent progress in demonstrating safe parenting techniques. Likewise, Ms. Shaub-Betcher testified Mother would not be able to safely parent the children in the near future because, despite over two years of services, Mother continued to display the same unsafe behaviors and had not demonstrated meaningful change. Ms. Shaub-Betcher testified that, based on her education and training in behavioral health, it was reasonable to conclude that, if Mother had failed to learn adequate parenting skills after more than a year of services, she likely would not do so. Reasonable evidence therefore supports the juvenile court's finding that there was a substantial likelihood Mother would be unable to exercise proper and effective parental care and control in the near future.

## II. *Best Interest of the Children*

**¶28** Mother additionally challenges the juvenile court's finding that termination of her parental rights was in the children's best interest. Mother claims the court erred when it found severance was in the children's best interest because "she is bonded to her children, and has made great strides in maintaining her relationship with them," and the lack of an adoptive placement "proves that [there] would be no detriment to allowing Mother the opportunity to parent her children in the future." Because reasonable evidence supports the court's best interest finding, Mother's claim fails.

**¶29** To effectuate severance, the court must find, by a preponderance of the evidence, termination of the parent-child relationship is in a child's best interest. A.R.S. § 8–533(B); *Kent K.*, 210 Ariz. at 284, ¶ 22, 110 P.3d at 1018. To support a best interest finding, the petitioner must prove that the child will affirmatively benefit from the termination. *Maricopa Cnty. Juv. Action No. JS–500274*, 167 Ariz. 1, 6, 804 P.2d 730, 735 (1990). This means that "a determination of the child's best interest must include a finding as to how the child would benefit from a severance *or* be harmed by the continuation of the relationship." *Id*. at 5, 804 P.2d at 734. The best interest requirement may be met if, for example, the petitioner proves a current adoptive plan exists for the child, *id*. at 6, 804 P.2d at 735, or even that the child is adoptable. *See JS-501904*, 180 Ariz. at 352, 884 P.2d at 238. The juvenile court may also consider evidence that an existing placement is meeting the needs of the child in determining severance is in the child's best interest. *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5, 982 P.2d 1290, 1291 (App. 1998).

¶30　　　In this case, the record supports the juvenile court's finding that severance was in the children's best interest. Ms. Shaub-Betcher testified that terminating Mother's parental rights was in the children's best interest because Mother cannot safely parent them. Ms. Shaub-Betcher stated DCS was looking for an adoptive placement that would take the children together, but S.B.'s foster mother was willing to adopt him if DCS was unable to find a home that could take both children. She opined that the children were adoptable and noted they had, in fact, been together in a two-parent potentially adoptive home in the past, but those adoptive parents had moved out of the state. Accordingly, although the children were not currently in a home that could adopt them together, the children are adoptable, and DCS has a plan to find the children a two-parent adoptive home that could meet their special needs. Reasonable evidence therefore supports the juvenile court's finding that terminating Mother's parental rights was in the children's best interest.

**CONCLUSION**

¶31　　　The juvenile court's order severing Mother's parental rights to S.B. and C.B. is affirmed.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama