NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

LAURA G., MANUEL A., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, E.H., Y.G., M.G., Y.G., I.G., D.G.,
*Appellees*.

No. 1 CA-JV 15-0212
FILED 1-28-2016

Appeal from the Superior Court in Maricopa County
No.  JD505167
The Honorable Karen L. O'Connor, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant Laura G.*

The Stavris Law Firm PLLC, Scottsdale
By Christopher Stavris
*Counsel for Appellant Manuel A.*

Arizona Attorney General's Office, Mesa
By Nicholas Chapman-Hushek
*Counsel for Appellee DCS*

---

**MEMORANDUM DECISION**

---

Presiding Judge Kenton D. Jones delivered the decision of the Court, in which Judge Samuel A. Thumma and Judge Peter B. Swann joined.

---

**J O N E S**, Judge:

¶1        Laura G. (Mother) and Manuel A. (Father) (collectively, the parents) appeal the juvenile court's order terminating their parental rights to M.A., I.A., and D.A.,[1] arguing the Department of Child Safety (DCS) failed to prove the statutory grounds for severance by clear and convincing evidence. For the following reasons, we affirm.

## FACTS[2] AND PROCEDURAL HISTORY

¶2        In March 2013, DCS removed six children, ages twelve, ten, seven, four, three, and one, from the care of Mother and Father after discovering the children were being left unattended for extended periods of time; the one-bedroom apartment in which the family lived was filthy and infested with cockroaches; Mother and the children were reportedly subject to violence and verbal abuse by Father; both parents refused to submit to urinalysis testing; and Mother admitted recent methamphetamine use. DCS filed a petition alleging the children were dependent as to both parents in early April 2013. The juvenile court found the children dependent and adopted a case plan of family reunification.

¶3        After being removed from the custody of Mother and Father, all six children reported additional instances of abuse and neglect and/or displayed behaviors consistent with trauma suffered while in the parents' care. E.G., Y.G., M.A., and I.A. all reported observing Mother and Father engage in domestic violence and/or physical abuse of their siblings. M.A.

---

[1]      Mother's parental rights to E.G., Y.G., and Y.R. were also terminated. Neither Mother nor these children's fathers contest that determination.

[2]      We view the facts in the light most favorable to upholding the juvenile court's order terminating parental rights. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010) (citing *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008)).

reported he had seen Mother hold a knife to Father's throat and hit him in the head with a frying pan. M.A. was routinely punched in the stomach by Father and had his hand broken when Father hit him with the buckle end of a belt. Y.R. was repeatedly struck with a belt by both Mother and Father, confined in a closet for "embarrassing the family" when her kindergarten teacher made a home visit to talk about her problems in school, and had her hand burned on the stove as a form of discipline. Y.G. also reported being hit by Father and confined in a closet.

¶4        M.A. reported the parents would lock themselves in their bedroom and leave the children to care for themselves and each other while roaches crawled on the walls and in their food. M.A., at only five years of age, was observed by his foster parents attempting to change his youngest brother's diaper on multiple occasions, and E.G. and Y.R. also displayed characteristics of parentification. M.A. experienced bedwetting following visitation with Father, D.A. had frequent night terrors, and Y.G. reported self-injurious behavior while in Mother's care. The children expressed a fear of roaches and I.A. used profanity and displayed disrespect and aggression toward women, purportedly resulting from being raised primarily by Father. Additionally, the children's medical needs were ignored, and they did not attend school regularly while in their parents' care. Prior to being removed, D.A. "lived his life in a playpen," and at sixteen months old, did not walk or talk.

¶5        Mother acknowledged a long history of violent relationships, including one with Father when the children were present. Mother also reported a history of substance abuse, spanning more than twenty years, starting with alcohol and then progressing to cocaine and daily methamphetamine use. Mother admitted being addicted to methamphetamine and explained she used the drug to cope with her parenting responsibilities. Indeed, by 1999, Mother had three children under the age of ten, including E.G., in her care. Mother gave birth to Y.G. in 2003 and another child in 2004; both tested positive for methamphetamine at birth.

¶6        After a failed suicide attempt, Mother completed a thirty-day inpatient substance abuse treatment program in 2004, but by 2005, gave birth to Y.R., who likewise tested positive for methamphetamine. Later that year, when Mother was thirty-one, the juvenile court terminated her parental rights to two children and appointed a permanent guardian for a third child based, in part, upon Mother's chronic substance abuse and

3

failure to engage in services. The three other children, E.G., Y.G., and Y.R. were sent to live with their father.[3]

¶7            In early 2008, M.A. was born substance-exposed to methamphetamine. In December 2008, the parents agreed to an in-home dependency, which was dismissed upon completion of prescribed services. In 2009, Mother gave birth to I.A.; in 2010, the three older children returned to live with her; and in 2011, Mother gave birth to D.A. At some point, Mother relapsed into drug use and admitted using methamphetamine consistently, even while participating in substance abuse treatment throughout the first nine months of the immediate dependency proceeding. She disclosed to her adult daughter that "this [drug use] is how she copes with life . . . how she deals with chaos."

¶8            Father also acknowledged a long history of abusing substances, including alcohol, cocaine, and methamphetamine, which led to six arrests for driving under the influence of alcohol.

¶9            Although DCS offered numerous services to Mother and Father, their initial participation in services was sparse. Mother did participate in supervised visitation, but her attendance was inconsistent and her interaction with the children was limited or non-existent; instead, Mother spoke with the parent aide while allowing the older children to take care of the younger. She also devoted most of her attention to one child and largely ignored the others, except when she made fun of one of the older children for not doing well on her homework and being unable to read. The parent aide service was closed out as unsuccessful because Mother did not complete the requirements.

¶10          Mother was assessed with methamphetamine dependence and began outpatient substance abuse treatment, but stopped attending, started using methamphetamine again, and was closed out of the service in August 2013 for lack of participation. Shortly thereafter, Mother was hospitalized for several days for suicidal ideation apparently resulting from a reaction between her use of methamphetamine and prescription medication. And, although Mother expressed some interest in discontinuing her relationship with Father in order to address her own personal challenges and focus on regaining custody of her children, she did not do so.

---

[3]       Mother's seventh child, born in 2007, is in the care of his father, and is not a party to this action.

¶11 Meanwhile, Father did not attend any scheduled intake for parent aide services, and the referral was closed. He was allowed to attend visits with Mother for a few months, but after telling Y.R. he hated her and "she better not come near him," his visitation was limited to only his biological children. He again failed to attend the intake, and visitation stopped. Between March 2013 and January 2014, Father missed several scheduled psychological exams, only occasionally submitted to urinalysis testing, and refused to participate in substance abuse treatment.

¶12 In September 2013, the juvenile court approved a concurrent case plan of severance and adoption. The five oldest children, including M.A. and I.A., expressed unequivocally throughout these proceedings they did not wish to be returned to their parents' care, and the juvenile court also suspended visitation upon recommendation of the children's therapist, who reported the visits were emotionally damaging to the children.

¶13 After DCS reported the parents had made "no significant progress" toward reunification, in January 2014, the case plan was changed to severance and adoption, and DCS filed a motion to terminate. The motion sought to terminate Mother and Father's parental rights on the grounds that: (1) the parents substantially neglected or willfully refused to remedy the circumstances that caused the children to be in an out-of-home placement for a period of nine months or longer; (2) the parents substantially neglected or willfully refused to remedy the circumstances that caused a child under the age of three, D.A., to be in an out-of-home placement for a period of six months or longer; and (3) Mother was unable to discharge her parental responsibilities because of a history of chronic abuse of dangerous drugs. *See* Ariz. Rev. Stat. (A.R.S.) § 8-533(B)(3),[4] (8)(a)-(b).

¶14 When the case plan was changed to severance and adoption, the parents increased their participation in services. Mother completed a ninety-day inpatient substance abuse treatment program in April 2014, self-referred for outpatient treatment afterwards, and successfully maintained sobriety through trial. However, Mother discontinued taking prescribed medications to address her depression and did not follow up on obtaining further care.

¶15 In May 2014, parent aide services and supervised visitation were re-initiated with the youngest child, D.A., and both parents exhibited

---

[4] Absent material changes from the relevant date, we cite a statute's current version.

appropriate skills and behavior toward him during weekly visits. But, both the DCS case worker and the children's therapist continued to object to visitation with the other children for several reasons, including the parents' failure to take responsibility for the trauma the children had experienced in their care. Despite the lack of face-to-face contact, Mother admitted she did not take the opportunity to write to her children very often. And, although the DCS caseworker recommended Father write letters to the children, particularly M.A. and I.A., with whom he had no other contact since January 2014, he did not do so.

¶16         Following the change in case plan, Father tested positive for methamphetamine three times before finally exhibiting an interest in addressing his substance abuse in February 2014. Father was assessed with amphetamine abuse disorder and began outpatient substance abuse treatment. His prognosis was described as guarded and his relapse potential high because he was unaware of relapse triggers, was exposed to substances in his daily life, and had few to no "non-using associates." Father did not test positive for any illegal drug after February 2014, but missed many drug tests. He also denied having ever engaged in any domestic violence with Mother or the children. Father ultimately completed outpatient substance abuse treatment in November 2014 and a recovery maintenance program in January 2015.

¶17         Father completed a psychological exam in June 2014 after missing three prior scheduled appointments. The psychologist assessed Father with depressive disorder, described Father's prognosis to become a minimally adequate parent as "guarded," and expressed concern the parents, together, would be unable to provide a safe home, free from domestic violence, for the children.

¶18         The parents attended nine sessions of couple's counseling, which they completed in November 2014, but the parties did not disclose the circumstances of their violent relationship to the treatment provider, and the counseling sessions did not address domestic violence. Mother also completed an eight-week domestic violence course in December 2014.

¶19         Mother underwent a psychological evaluation in October 2014 and a psychiatric evaluation in January 2015. She was assessed with a severe stimulant disorder in early remission, recurrent major depressive disorder in partial remission, and generalized anxiety disorder. The psychiatrist also observed traits of post-traumatic stress disorder and antisocial and dependent personality disorders. Both professionals described the prognosis for Mother's ability to be a minimally adequate

parent in the foreseeable future as "poor" for the older children, and "slightly better" relative to D.A., the only one of the six children with whom she had any contact since January 2014. But, even then, they expressed concern, given Mother's history and the interplay of her substance abuse, mental health issues, and social challenges, that she would replicate issues of substance abuse, domestic violence, and inappropriate living conditions in the future. These challenges exacerbated Mother's already high risk of relapse in light of her admission to using methamphetamine to cope with the stress of day-to-day parenting.

¶20 The psychologist also expressed concern regarding Mother's ongoing relationship with Father, which reflected an inability to prioritize the needs of the children, and stated he did not believe the children could be safely returned to Mother. The psychiatrist opined Mother's conditions were likely to continue for a prolonged, indeterminate period given her history of difficulties, lack of insight, and failure to end the relationship with Father, and agreed that, even if Mother completed the recommended services, the children could not be safely returned to her care.

¶21 At that time, nearly two years after the dependency was filed, the parents had not obtained appropriate housing for the children or taken any steps to address DCS's concerns regarding domestic violence. The two were reportedly self-employed, working together "do[ing] cash for junk cars." In December 2014, DCS amended its petition to include, as grounds for severance, that the parents had been unable to remedy the circumstances that caused the children to be in an out-of-home placement for a period of fifteen months or longer, and there was a substantial likelihood they would be unable to exercise proper and effective parental care and control in the near future. *See* A.R.S. § 8-533(B)(8)(c).

¶22 At the six-day severance trial, the DCS caseworker testified both Mother and Father had substantially neglected or willfully refused to remedy the circumstances giving rise to the dependency within a reasonable time and had not properly participated in services or adequately addressed the children's past trauma or current fear of returning to their care. Additionally, Mother's psychologist expressed concern regarding returning any children to Mother for an extended period of time, noting the once weekly visitation "only demonstrate[s] parenting during a brief period of time."

¶23 In June 2015, the juvenile court granted the motion to terminate. As to Mother, the court granted severance based upon her chronic substance abuse and the length of time the children had been in out-

of-home care. *See* A.R.S. § 8-533(B)(3), (8)(a)-(c). As to Father, the court granted severance based upon the length of time in out-of-home care. *See* A.R.S. § 8-533(B)(8)(a)-(c).

¶24 Mother and Father timely appealed. We have jurisdiction pursuant to A.R.S. §§ 8-235, 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

¶25 To terminate parental rights, the juvenile court must find by clear and convincing evidence the existence of at least one of the statutory grounds for termination enumerated in A.R.S. § 8-533(B) and must find by a preponderance of the evidence that termination would serve the child's best interests. Ariz. R.P. Juv. Ct. 66(C); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000). We "will affirm a juvenile court's order based on findings of clear and convincing evidence unless no reasonable evidence supports those findings." *Jennifer B. v. Ariz. Dep't of Econ. Sec.*, 189 Ariz. 553, 555 (App. 1997).

¶26 Mother and Father do not challenge the juvenile court's best interests finding or that DCS provided appropriate reunification services. Rather, each argues on appeal that DCS did not prove by clear and convincing evidence any of the statutory grounds for severance enumerated in A.R.S. § 8-533(B).

## I. The Juvenile Court Did Not Abuse its Discretion in Terminating Mother's Parental Rights.

¶27 A parent's rights may be terminated if: "the parent is unable to discharge parental responsibilities because of . . . a history of chronic abuse of dangerous drugs, controlled substances or alcohol and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." A.R.S. § 8-533(B)(3); *see also Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 377, ¶ 15 (App. 2010). To sever on this ground, there must be evidence and a finding that reasonable efforts were made to reunify the family, or that such efforts would not restore the parent's ability to care for a child within a reasonable time. *See Jennifer G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 450, 453, ¶ 12 (App. 2005) (citing *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 191-92, ¶¶ 31-34 (App. 1999)).

¶28 Mother acknowledges her history of substance abuse and its corresponding deleterious effect upon the children. She contends, however, the juvenile court erred in determining the condition would likely

continue because "[t]he evidence regarding [the potential for relapse] is based upon studies of the general population and is not specific to [Mother]." This contention is not supported by the record.

¶29 The psychiatrist explained in his written evaluation that:

> As a result of the depression and anxiety or the substance abuse and particularly in light of dysfunctional and abusive relationships with significant others and her grandfather, [Mother] is likely to have recurrence of the mood disorders and the substance abuse. Each of the conditions is likely to increase the likelihood of recurrence of the other conditions. That is to state that, with enough depression, she may be more likely to abuse drugs and, with drug abuse, she may be more likely to have a mood disorder.

He also testified the likelihood Mother would relapse on methamphetamine remained high, even after a year of sobriety, given her mental health issues, the multitude of stressors in her life, and her lack of insight into her past behavior. The psychologist likewise described Mother's prognosis to become a minimally adequate parent to the older children as poor, noting "her history suggests that [Mother] replicated similar concerns after her parental rights were terminated to [previous] children." At trial, the psychologist testified, based upon the "intensity, frequency, and duration of concerns" regarding Mother's substance abuse, "there is a significant risk of it reoccurring in the future." This trial testimony was consistent with the written assessments, even upon learning that Mother had participated in services and made some improvements.

¶30 Mother's period of sobriety at the time of trial is not dispositive. "[D]rug abuse need not be constant to be considered chronic" and, "in considering the impact of drug addiction, [the juvenile court] must consider the treatment history of the parent to gauge the likelihood the parent will be in a position to parent the child in the foreseeable future." *Raymond F.*, 224 Ariz. at 377-78, ¶¶ 16, 25 (quoting *In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998)). A "temporary abstinence from drugs and alcohol does not outweigh [a parent's] significant history of abuse." *Id.* at 379, ¶ 29. Mother reported periods of sobriety in the past, including five years from 2009 to 2013 and almost three months in 2013 after the children were removed, only to resort yet again to illegal drugs with a corresponding negative impact on the well-being of her children. According to the psychologist who evaluated her, Mother's history suggests "that without

monitoring or oversight . . . that could also increase the risk for relapse in the future."

**¶31**        Moreover, Mother did not establish any period of sobriety at a time when she had even one child in her care. This is particularly significant given Mother's admission to using methamphetamine to cope with the stress of parenting. Thus, the record does not demonstrate Mother has been, or would be able to, refrain from using drugs "in a non-custodial and unstructured setting, similar to that in which a [mother] would be expected to raise [her] children." *Id.* This is particularly relevant given that Mother's mental health and history of domestic violence — both factors increasing her risk of relapse — were largely unaddressed at the time of trial. Additionally, Mother's "failure to remedy [her] drug abuse despite knowing the loss of [her children] was imminent, is evidence [s]he has not overcome [her] dependence on drugs." *Id.*

**¶32**        We defer to the juvenile court's evaluation of the evidence and the inferences to be drawn therefrom. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 13 (App. 2002). Here, the children had been in out-of-home care for more than two years. While Mother's recent efforts are laudable, her mental health and the incidents of domestic violence with Father, identified as triggers for substance abuse, remained largely unaddressed. In such cases, "[t]he interests in permanency for [the children] must prevail over [a parent's] uncertain battle with drugs." *Raymond F.*, 224 Ariz. at 379, ¶ 29 (quoting *In re N.F.*, 579 N.W.2d at 341); *see also Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994) (affirming severance after one year of out-of-home care where parent eventually made successful efforts at rehabilitation in eight months before trial, concluding those efforts, "while commendable, were 'too little, too late' for purposes of this severance action"). We conclude reasonable evidence was presented upon which the court could find DCS proved by clear and convincing evidence that severance was warranted based on Mother's chronic substance abuse.[5]

---

[5]        Because reasonable evidence supports the juvenile court's conclusion that severance was warranted upon the grounds of substance abuse, we need not address Mother's claims pertaining to other grounds. *See Jesus M.*, 203 Ariz. at 280, ¶ 3 (citing *Michael J.*, 196 Ariz. at 251, ¶ 27, and *Maricopa Cnty. Juv. Action No. JS-6520*, 157 Ariz. 238, 242 (App. 1988)).

## II. The Juvenile Court Did Not Abuse its Discretion in Terminating Father's Parental Rights.

¶33        A parent's parental rights may be terminated if:

> [DCS] has made a diligent effort to provide appropriate reunification services and . . . [t]he child has been in an out-of-home placement for a cumulative total period of nine months or longer pursuant to court order . . . and the parent has substantially neglected or wil[l]fully refused to remedy the circumstances that cause the child to be in an out-of-home placement.

A.R.S. § 8-533(B)(8)(a).   Father argues DCS failed to demonstrate by clear and convincing evidence he had substantially neglected or willfully refused to remedy the circumstances that caused the children to be in out-of-home care.   In doing so, he focuses on his eventual participation in services beginning in March 2014.   That, however, is not the full story.

¶34        The efforts Father made during the first nine months after the children's removal comprise a short list — namely, accompanying Mother on her weekly supervised visits. During this period, Father failed to engage with the parent aide, refused to participate in any substance abuse testing or treatment, and failed to attend three scheduled psychological exams. Father continued to deny any domestic violence despite the numerous reports of verbal and physical abuse within the home.   Only after the children had been in out-of-home care for almost a year did Father begin actively participating in services.

¶35        In *JS-501568*, we rejected a similar argument "that termination was unfair in light of [the parent's] successful efforts at rehabilitation in the eight months prior to the severance hearing," holding instead that severance is proper "even though the parent eventually begins a successful recovery before the severance hearing." 177 Ariz. at 577.   The statute sets a reasonable time period for parents to assume their parental responsibilities and is intended to prevent children from "being shuttled from one foster family to the next for as long as it takes their biological parents to assume their responsibilities and take positive steps toward recovery" and reunification.   *Id.*   Thus, "[l]eaving the window of opportunity for remediation open indefinitely is not necessary, nor do we think that it is in the child's or the parent's  best interests."   *Id.*   When those efforts do not occur within the statutory period, they may be "too little, too late" for purposes of severance.   *Id.*

**¶36** While Father's eventual progress is commendable, it was too little too late. By the time the severance trial completed, the children, only seven, six, and three years old, had been in out-of-home care for well over two years. Considering the evidence in the light most favorable to upholding the juvenile court's order, as we are required to do, reasonable evidence supports the court's conclusion that Father substantially neglected or willfully refused to remedy the circumstances leading to the children's out-of-home care within the statutory period.[6]

## CONCLUSION

**¶37** The juvenile court's order terminating the parents' parental rights is affirmed.



Ruth A. Willingham · Clerk of the Court
FILED: ama

---

[6] Based on this conclusion, we need not address Father's claims pertaining to other grounds. *See Jesus M.*, 203 Ariz. at 280, ¶ 3 (citing *Michael J.*, 196 Ariz. at 251, ¶ 27, and *JS-6520*, 157 Ariz. at 242).