756 P.2d 335

**In the Matter of the Appeal in MARICOPA COUNTY JUVENILE ACTION NO. JS-6520.**

**No. 1 CA-JUV 397.**

Court of Appeals of Arizona, Division 1, Department C.

Feb. 18, 1988.

Review Denied July 12, 1988.

 

Virginia Freeman, Phoenix, for appellant.

Mark D. Winemiller, Phoenix, for Children.

Robert K. Corbin, Atty. Gen. by C. Eileen Bond, Asst. Atty. Gen., Phoenix, for appellee Arizona Dept. of Economic Sec.

## OPINION

GRANT, Judge.

The natural father of three minor children appeals from an order of the juvenile court terminating his parental rights. The only issue on appeal is whether the evi-

dence supported the grounds for termination.

## FACTS

Three children, 12–year–old David Ray, 11–year–old Teresa Marie and 7–year–old Johan Michael, are the subjects of the termination proceeding. Appellant is the biological father of all three children. David and Teresa have the same mother, Kathleen J.; Johan's mother is Cheryl M., Kathleen J.'s parental rights were terminated and Cheryl M. signed a consent, relinquishing her rights to Johan.

The youngest child, Johan, first came to the attention of the Arizona Department of Economic Security (DES) in January, 1982. At that time his mother was jailed on a charge of drunk and disorderly conduct. Prior to her arrest, witnesses reported that she was both verbally and physically abusive to Johan. On February 16, 1982, DES placed Johan in a temporary foster home. The court subsequently found him dependent and made him a ward of the court. For three months in 1982 Johan was placed in the physical custody of appellant. This placement, however, proved unsuccessful, and Johan has remained in foster care since August of 1982. Presently he is in a "fost-adopt placement," which is a potential adoptive home.

The two older children, David and Teresa, came to the attention of DES in May 1982, when their maternal grandmother contacted the agency and advised it that she was unable to continue caring for her grandchildren. The children's mother had left the children in the grandmother's care for "the weekend" two weeks earlier. Subsequently, the grandmother received a letter from her daughter, advising her that she was in New Mexico and could not take the children. David and Teresa were later placed in foster care and made wards of the court on January 17, 1983. The children's chances for adoption are "slim" according to DES; therefore long-term foster care is the probable treatment plan.

All three children have been in foster care since mid–1982. The two oldest children are in the same home. The youngest child, Johan, has seen his half-siblings infrequently.

Between 1982 and 1985, DES offered appellant a wide range of services to facilitate reintegration of the family. These included parenting classes, mental health counseling, and referrals to a variety of agencies for treatment of an alcohol problem. Appellant declined or failed to cooperate with these remedial services, claiming he was capable of controlling his admitted life-long drinking problem without assistance.

Appellant visited David and Teresa on a continuous, if sporadic, basis prior and subsequent to the filing of the petition for severance. DES did not require appellant to arrange visitation through the agency because he had a prior relationship with the foster parents of David and Teresa. Because of this arrangement, DES was unaware of the exact number of these visits. Appellant's contacts with Johan, who was in a different foster home than the other two children, has been nearly non-existent. In 1983, appellant saw his then 2–year–old son a total of four times. Appellant visited Johan only once in 1984 at Christmastime and once in 1985, again during the Christmas holidays.

In July 1985, DES filed a petition to terminate the parent-child relationship between appellant and his three children, alleging abandonment. In October 1985 and May 1986, appellant then entered into agreements with DES to work for his children's return. Appellant agreed to attend Alcoholics Anonymous, have individual therapy, maintain a regular visitation schedule with his children, and obtain a suitable home for all of them. The termination hearing was continued in order to provide appellant an opportunity to regain his children.

Appellant failed to follow through on the provisions of these agreements, and on October 17, 1986, DES amended its petition for termination to include the grounds of inability to parent due to mental illness and/or a history of chronic alcohol abuse pursuant to A.R.S. § 8–533(B)(3) and length of out-of-home placement pursuant

to A.R.S. § 8–533(B)(6)(a) and (b). The juvenile court terminated the parent-child relationship between appellant and Johan based on abandonment, mental illness and alcohol abuse, and both out-of-home placement grounds. Appellant's rights to David and Teresa were terminated on all of the above except for abandonment grounds.

## LEGAL ISSUES

### ABANDONMENT

Unquestionably, parents have a fundamental liberty interest in the care, custody and management of their children. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Therefore, while the best interest of the child is a valid factor in deciding whether to terminate the parent-child relationship, it cannot be the sole basis for termination. *Juvenile Appeal S–1607*, 147 Ariz. 237, 238, 709 P.2d 871, 873 (1985). However, this right to parent is not absolute. The state has an interest in the welfare and health of children. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). When the welfare of the child is in serious jeopardy, the state will act to protect the child and will interfere with this valued relationship. *Juvenile Appeal J–5666*, 133 Ariz. 157, 161, 650 P.2d 459, 463 (1982). Arizona courts have recognized that parental rights should be terminated only when concerted effort to preserve the relationship fails. *Juvenile Appeal S–111*, 25 Ariz.App. 380, 387, 543 P.2d 809, 817 (1975). Towards this end, DES has an affirmative duty to make all reasonable efforts to preserve the family relationship. *DES v. Mahoney*, 24 Ariz. App. 534, 540 P.2d 153 (1975).

A.R.S. § 8–533 sets forth the grounds for termination of parent-child relationships. The statute reads in pertinent part:

B. Evidence sufficient to justify the termination of the parent-child relationship shall include any one of the following, and in considering any of the following grounds, the court may also consider the needs of the child:

1. That the parent has abandoned the child.

. . . .

3. That the parent is unable to discharge the parental responsibilities because of mental illness, mental deficiency or a history of chronic abuse of dangerous drugs, controlled substances or alcohol and there are reasonable grounds to believe that the condition will continue for prolonged indeterminate period.

. . . .

6. That the child is being cared for in an out-of-home placement under the supervision of the juvenile court, the division or a licensed child welfare agency, that the agency responsible for the care of the child has made a diligent effort to provide appropriate remedial services and that either of the following circumstances exists:

(a) The child has been in an out-of-home placement for a cumulative total period of one year or longer pursuant to court order and the parent has substantially neglected or wilfully refused to remedy the circumstances which cause the child to be in the out-of-home placement.

(b) The child has been in an out-of-home placement for a cumulative total period of two years or longer pursuant to court order, the parent has been unable to remedy the circumstances which cause the child to be in an out-of-home placement and there is substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future.

On review, the appellate court will accept the juvenile court's findings of fact in support of severance unless they are clearly erroneous. *Juvenile Appeal S–1607*, 147 Ariz. at 238, 709 P.2d at 872 (1985).

Following the termination proceedings the juvenile court made the following conclusions of law:

(1) that the court has jurisdiction over this matter pursuant to A.R.S. § 8–531, *et seq.;*

(2) that as to all three of the children, the natural father ... is unable to discharge parental responsibility because of mental illness and a chronic

abuse of alcohol and there are reasonable grounds to believe that these conditions will continue for a prolonged, indeterminate period;

(3) that as to all three of the children, they have been in an out-of-home placement for a cumulative total period of one year or longer pursuant to court order and he has substantially neglected or wilfully refused to remedy the circumstances which cause the children and each of them to be in an out-of-home placement;

(4) that the children and each of them have been in an out-of-home placement for a cumulative total period of two years or longer pursuant to court order and the father has been unable to remedy the circumstances which cause the children and each of them to be in an out-of-home placement and there is a substantial likelihood that the father will not be capable of exercising proper and effective care and control in the near future;

(5) that as to Johan, the father has abandoned the child and has made no effort to maintain a parental relationship with him. In the opinion of the court, the evidence indicates he has made only token efforts to communicate with the child and none to support him;

(6) that the state has failed to meet its burden of clear and convincing proof as to the abandonment of David and Teresa by the father, ... and, therefore, those allegations in the petition as to abandonment of those two children will be dismissed.

▮ We will address first the termination of the parent-child relationship of appellant and his youngest son, Johan. A finding of any of the enumerated statutory grounds is sufficient to justify termination of the parent-child relationship. In this case, the juvenile court found evidence sufficient on three separate grounds. Because we find clear and convincing evidence supporting abandonment, we will not address the remaining grounds.

A.R.S. § 8–533(B)(1) provides for termination of the parent-child relationship if the evidence demonstrates that the parent has abandoned the child. These terms, by their very nature must be somewhat elastic. *Juvenile Appeal JS–4283*, 133 Ariz. 598, 601, 653 P.2d 55, 58 (1982). The Arizona Supreme Court has stated that the appropriate test for severance is whether "there has been a conscious disregard of the obligations owed by a parent to a child, leading to the destruction of the parent-child relationship." *Juvenile Appeal S–1607*, 147 Ariz. at 238, 709 P.2d at 872. To find abandonment the trial court determines whether the evidence supports a finding that there was "intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." *Id. quoting Anonymous v. Anonymous*, 25 Ariz.App. 10, 12, 540 P.2d 741, 743 (1975).

The evidence regarding Johan is clear and convincing, demonstrating that appellant abandoned his youngest son. Johan was 17 months old when he was removed from the care of his natural mother. The record is silent regarding whether Johan also resided with appellant at that time or whether appellant had ever provided a home for Johan. The record is clear, however, that appellant's efforts to develop and maintain a relationship with his young son were insufficient. Soon after DES removed Johan from his mother's care, it placed him in the care of appellant. This placement lasted only two months. While Johan was in foster care, appellant visited his son only four times the first year. For the next two years, appellant saw his son only once a year. Certainly the sum of these contacts does not demonstrate any participation by or presence of appellant in Johan's life.

The court also heard evidence suggesting that the parent-child bond never developed between Johan and appellant. Johan's social worker, Marsha Hubbard, testified that Johan referred to his *three* fathers. Ms. Hubbard stated Johan knew that "[o]ne was the adoptive father. One was the foster father and one was the real father."

The social worker added that Johan knows that the "real father is just a *pretend* father." (Emphasis added.)

Finally, Johan is in a fost-adopt home; it is therefore in his best interests that the parent-child relationship be severed so that he may be freed for adoption. Thus the juvenile court did not abuse its discretion when it found that appellant had abandoned Johan. Absent such abuse, we will not set aside the court's findings. We therefore affirm the juvenile court's disposition regarding Johan.

We turn now to the more difficult issue: whether the juvenile court erred when it terminated the parent-child relationship between appellant and his two older children, David and Teresa. Although the juvenile court dismissed the abandonment charge, it did find evidence sufficient on both out-of-home placement grounds and mental illness/alcohol grounds to terminate the parental relationship.

### OUT–OF–HOME PLACEMENT

Effective July 1986, the legislature amended A.R.S. § 8–533 to include out-of-home placement as grounds for termination of parent-child relationship. The amendment allows termination if the child has been under the supervision of the juvenile court or licensed welfare agency for a prescribed period of time and the parents' behavior satisfies certain criteria. A.R.S. § 8–533(B)(6). The criteria vary with the length of time the child is in placement. If the child is in an out-of-home placement for one year or more, the court must find that the parent has "substantially neglected or wilfully refused to remedy the circumstances which cause the child to be in an out-of-home placement." A.R.S. § 8–533(B)(6)(a). However, the standard of parental contact that will support termination is different if the child is in an out-of-home placement for two or more years. Here, the court need only find that the "parent has been unable to remedy the circumstances which cause the child to be in an out-of-home placement" and that "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8–533(B)(6)(b). Thus, the legislature has determined that for the child in an out-of-home placement for the shorter, one year period, the standard of parental conduct that will support termination is high: A wilful refusal to remedy the situation. For the longer two year period, the standard is lessened: an inability to remedy the situation.

Legislative history suggests that this amendment was in response to the increasing number of children in foster care whose parents maintain parental rights but refuse to assume their parental responsibilities. The express purpose of the amendment is to "expedite the adoption of numerous children who remain in temporary foster care with no hope of being returned to their natural parents and in so doing promote a stable and long term family environment for these children." 1986 Ariz.Sess.Laws, Ch. 205 §§ 1 and 6.

Thus, the intent of this provision was to enable children to have a permanent family through adoption. During committee meetings, some legislators expressed concern that it would be possible to sever a parental relationship and then not have the child adopted. *See* Minutes of Committee on Health and Welfare, February 25, 1986. Addressing this concern, Mr. Richard Bertozza, chairman of the State Foster Care Review Board, responded that there would be no guarantee, but he believed this provision would allow more children to find permanent homes. Another member of the Board, Dave Byers, stated that there are three types of children that he works with: "(1) the small child that will be returned to their parents; (2) the child nearing the age of 18; and (3) the small child that will never be returned to their parents." It was the children in the last group that the amendment was designed to address.

Unlike their younger brother Johan, David and Teresa are not in a fost-adopt home (a potential adoptive home). The juvenile court heard testimony regarding the possibility of adoption for David and Teresa. Uncontroverted testimony by their social worker, John Ruiz, indicates that the

two oldest children of appellant are, at best, questionable candidates for adoption:

Q. ... [A]ssuming there was a severance—what's the possibility that they could be adopted?

A. As far as the Adoption Unit is concerned, it's very slim ... unless there was somebody that really knew the kids, already, and wanted to adopt them.

Q. So, as far as their situation, we are looking at long-term foster care as a probability; regardless of whether there is a severance. Is that right?

. . . .

A. Yes.

The court itself questioned what interests of the children would be served by this severance:

THE COURT: Assume that, for a moment, what sense is it then? What would be served by severing his paternal rights as to David and Teresa, under those circumstances?

How does that help David or Teresa?

BY THE WITNESS: In my opinion, it's simply because—

THE COURT: Assuming he meets the statutory grounds. Let's assume that there are many he qualifies under.

What my question is is what is that going to do? What purpose will that serve by severing him; if the children are going to live with his brother or his mother or so forth?

BY THE WITNESS: Okay. The way I understand it, if the case goes on forever, indefinitely, if he were not severed, just he would surface every six months.

THE COURT: He is going to surface every six months at his mother's place or brother's place, regardless of what I do here.

Right?

Is that correct?

BY THE WITNESS: Right.

THE COURT: And he is still going to be their biological father, no matter what order this Court makes.

Correct?

BY THE WITNESS: Correct.

THE COURT: So, what sense is there in severing him, under those circumstances? What are we accomplishing here for the children by doing this?

BY THE WITNESS: It would be—

I'm looking at it from a different viewpoint, from a caseworker's viewpoint. I am not necessarily saying that [the father] can never see those children again.

We believe that David and Teresa are not the type of children that the amendment to A.R.S. § 8–533 was designed to benefit. They are not very young children; nor are they adoptable. Moreover, while the legislative history of A.R.S. § 8–533(B)(6) contemplated the possibility that a child might be adopted after the court ordered severance, nothing in that history suggests that the provision should be used to allow a court, knowing full well that the child was unadoptable, to sever the parent-child relationship. The stated purpose of the amendment is to "free children for adoption" not to free DES from the responsibility of working with recalcitrant or uncooperative parents.

MENTAL ILLNESS/ALCOHOL ABUSE

■ We turn now to whether the evidence will support termination on the remaining ground: inability to parent due to mental illness and alcohol abuse. The right to parent one's natural children is a fundamental right. *Santosky*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. The state's interest, at stake in a severance proceeding, is its *parens patriae* interest in preserving and promoting the welfare of the child. *Id.* at 766, 102 S.Ct. at 1401, 71 L.Ed.2d at 615. When the welfare of the child is seriously jeopardized, the state's interest will override this constitutionally protected right. *Juvenile Appeal JD–561*, 131 Ariz. 25, 27–28, 638 P.2d 692, 694–95 (1981). A.R.S. § 8–533(B)(3), however, does not provide for severance of parental rights merely because the child might be better off in another environment. "The fundamental liberty interest of the natural parents in the care, custody and management of their child does not evaporate simply because they have not been model par-

ents or lost temporary custody of their child to the state." *Santosky v. Kramer,* 455 U.S. at 743, 102 S.Ct. at 1395, 71 L.Ed. 2d at 606. The parents' inability to care for the child must show a danger to the child's welfare. *Juvenile Appeal JS–5209,* 143 Ariz. 178, 692 P.2d 1027 (1984). Thus, while the best interests of the child may not be the sole basis for termination, it must necessarily be a consideration.

In this case, the juvenile court heard testimony regarding appellant's alcohol abuse and mental health. Psychiatrist Donald Rumann diagnosed appellant as suffering from alcohol dependence, in remission, and an anti-social personality disorder. Asked whether appellant could adequately parent his children, Dr. Rumann replied, "I believe that [appellant] would have extreme difficulty, based on his personality disorder, ... functioning as an adequate parent." Dr. Rumann noted that during the time David and Teresa have been in placement, appellant has not had to deal with "day-to-day demands, responsibilities or whims of his children." Dr. Rumann testified that appellant is better suited to the role of "Uncle–Daddy" than that of "Daddy."

Dr. Rumann testified further that appellant's personality disorder, not his drinking, is the decisive factor in his ability to parent:

Q. Now suppose [appellant] never drank again, is there residual effect from the alcohol dependency on his ability to parent; even assuming he never takes another drink?

A. Based on his personality disorder, I believe that whether he takes another drink or not is not a factor in the case. His personality will continue to present problems with him to be an effective parent; not necessarily the alcohol....

Nor did Dr. Rumann believe appellant was amenable to any treatment program. Dr. Rumann believed the nature of appellant's illness prevents him from being consistent or following through with any rehabilitation plan. Therefore, he viewed appellant as being unable to benefit from any counseling program. Dr. Rumann sug-gested that due to this illness, appellant, would demonstrate a history of appointment cancellation; but always with a good excuse or reason. Such has been appellant's history regarding the treatment programs suggested by DES: appellant's initial determination to receive treatment followed soon by a dismal attendance record.

Testimony indicates that David and Teresa's adjustment in foster care has been good. At the time of the hearing, the children had been in the same foster placement for more than four years. The foster parents apparently do not wish them removed from their care. Except for the possibility of placement with the paternal grandmother, it does not appear that DES contemplates changing the children's environment.

The children's social worker, John Ruiz, was unaware of any reason why David and Teresa should not have contact with [their father]:

Q. Based upon your contacts with [appellant] and the children, is there anything that has happened or appears might happen that there is a reason that the children should not have contact with [him]?

A. No.

....

Q. Is severance of [appellant's] rights a condition placing them with the grandmother?

A. It's not, as far as I know.

Q. You also testified that the current foster parents have an attachment to the children.

A. Yes.

Q. Aside from possible placement with the grandmother, is there any reason [for the children not] to continue to live there?

A. Indefinitely, no.

Dr. Rumann, the psychiatrist, when questioned regarding whether it would be beneficial for the children to have contact with their father, indicated that before he could answer such a question, the children should be evaluated.

Q. And let's assume for the moment, concerning the older children, if they were to remain a foster home until they turn eighteen and that they wanted to maintain contact with [appellant], do you feel it would be beneficial for them to have that contact or not to have that contact?

. . . .

A. As I said in the recommendation to the Court, the older children's needs and conditions would have to be evaluated to determine ... the appropriateness or validity of him having contact with them ... At this point, they already have a few more years in development. So, it would depend on where they are at to determine whether they would be hurt or benefitted by continued contact.

. . . .

Q. Would it be your opinion that prior to the severance proceedings, perhaps the Department of Economic Security should have explored such evaluation of the children?

A. I feel it would be beneficial for the children, yes, to understand what their needs are and how they feel about the situation.

Q. Would it also be beneficial to DES in formulating their opinion?

A. I believe it might help them, yes; if they had some kind of assessment.

In studying the record, we do not find one reference to how the children would be endangered or harmed by allowing the parental relationship to remain intact. Nor do we find one indication of the benefit that severance will bestow on the children. In fact, when pressed by the court itself, the social worker, John Ruiz, replied only that severance was an appropriate step "from a case worker's viewpoint." Such a reason cannot support the severance of the parent-child relationship. We believe a termination of parental rights, the destruction of the natural family, must serve more than a casework goal. DES, by means of its petition, seeks to permanently sever appellant's ties to his children. Not only would termination deny appellant physical custody, but it would also deny him the right to visit, communicate with, or regain custody of his children.

The rule of law that prevents the best interest of the child from being the sole factor supporting termination does not however mandate that the child's interests may not be a factor at all. In this case, due to his mental illness, we have a father incapable of parenting full time adequately, but, a father nevertheless, who has maintained contact with his children. We have older children who have adjusted to long term foster care and whose chances for adoption are described as "slim." Moreover, we have expert testimony that suggests the children should be evaluated before terminating the parent-child relationship. And finally, we have a record devoid of any reference to the *benefit* of severance for the children or the *detriment* should severance be denied.

For the above reasons, we reverse and remand so that the juvenile court may hear testimony and evaluate the effect on David and Teresa of the termination of their parent-child relationship with appellant. We affirm the juvenile court's termination of the parent-child relationship as to Johan.

SHELLEY, P.J., and
KLEINSCHMIDT, J., concur.