STARING, Presiding Judge:
¶ 1 This appeal involves the termination of parental rights of Titus S., an out-of-state father, to T.S., his fourteen-year-old daughter *1140 and R.S., his thirteen-year-old son. In the unusual circumstances presented here, we conclude the court's best-interests finding was an abuse of discretion and, accordingly, we reverse the termination order.
Factual and Procedural Background
¶ 2 In October 2015, T.S. and R.S. were living with their mother, Ariana E., and their stepfather, Donald M., when the Department of Child Safety (DCS) took them into temporary custody based on reports of domestic violence between the couple and allegations that Ariana was a methamphetamine addict. At the time, Titus was living in Nebraska, having left Tucson in 2011 or 2012. He had regularly sent Ariana financial support, as well as gifts for the children, before he suffered a work-related injury in the summer of 2014.[1]
¶ 3 Since that injury, Titus has been unemployed, except for occasional "odd jobs," and his application for disability payments was still pending as of the adjudication hearing. He has seen the children only once since the injury, in the fall of 2014. He said he was aware of Ariana's history of drug abuse "years back," noting that the children had lived with him for six months while Ariana was in a drug rehabilitation program "eight to nine years" before the children's removal in 2015. But he maintained he was unaware of any substance-abuse issues when he left Arizona or when he last saw her and the children in 2014. According to a permanency report, once DCS became involved, "he asked if he could pick up the children now." But he did not have custody orders, and DCS reported a "safety concern[ ]" based on Ariana's statement that Titus used marijuana and Titus's report that he has had two DUI convictions and has a breathalyzer-controlled ignition device installed on his vehicle. The children were adjudicated dependent as to Titus in November 2015, after he admitted the allegations in an amended dependency petition.
¶ 4 In January 2016, DCS reported that Titus had participated in telephone calls with the children and had sent them Christmas gifts but had not responded to the DCS case worker and had not completed a referral, made earlier that month, for an initial drug screen. DCS had nonetheless begun completing an ICPC[2] packet for Titus to seek approval as a placement. In a minute entry following a February dependency review hearing, the juvenile court noted the "attempts to locate a drug testing facility for [Titus]," found Titus "partially compliant" with reunification goals, and found DCS had made reasonable efforts to reunify the family.
¶ 5 Throughout the dependency, DCS reported Titus had "low" or "partial" participation in reunification services. In June 2016, the juvenile court found Titus "in substantial compliance with the case plan," but added, "[T]here is difficulty ascertaining his compliance based on his out of state status." By a September permanency hearing, an ICPC placement for Titus was "tentatively approved" pending a drug test and home preparations, and the children's attorney filed an objection to DCS's request to change the case plan to severance and adoption, stating, "If return to [Ariana] is not possible [T.S. and R.S.] want to be placed with [Titus]." In its minute entry, the court noted that the children were "agreeable with a guardianship" and that DCS had, at the hearing, recommended guardianship as a new case plan goal. The court did not change the case plan but "grant[ed] leave to all parties to file any motion they deem to be appropriate prior to the next hearing," which it scheduled for both initial guardianship and initial severance hearings. The court found Titus's compliance with his DCS case plan was "unclear ... as he lives out-of-state and the Court does not have adequate information."
¶ 6 In January 2017, DCS reported Titus had completed a parenting class but still had not completed baseline drug testing or a psychological evaluation, and DCS had deferred *1141 individual counseling services pending the evaluator's recommendation. Noting that no motion for termination or guardianship had yet been filed, the juvenile court granted Ariana's request for mediation, changed the case plan goal "to severance and adoption and permanent guardianship," and ordered DCS to "file a severance motion or a motion for appointment of a permanent guardian or both if no resolution is reached at the mediation." The court further ordered Titus to submit to a baseline hair follicle drug test.
¶ 7 At a status hearing the following month, DCS told the juvenile court that the children were unwilling to consent to an adoption[3] and that, although T.S.'s placement was willing to adopt her, they were unwilling to serve as permanent guardians. Accordingly, DCS asked for additional time to identify an "appropriate" placement before filing a motion for permanent guardianship. Titus told the court he had completed his psychological evaluation and would be submitting to a hair follicle test, and the court scheduled a permanency hearing for May.
¶ 8 Before the May 2017 hearing, DCS reported a hair follicle test Titus completed in March had been positive for THC,[4] and his urine test had shown the presence of Oxazepam, Nordiazepam, and Temazepam. Titus told DCS the THC result was caused by his recreational use of marijuana during a recent trip to Colorado and the other substances were related to prescription medication for his back injury. But, according to DCS, Titus had not responded to repeated requests for documentation of all his prescriptions. Nor had he provided DCS with documentation of his income.
¶ 9 In its report, DCS also confirmed that Titus had completed his psychological evaluation. Although "individual therapy was not a direct requirement" recommended in the "psycho-social assessment," the DCS case worker believed "individual counseling would be necessary to address substance use concerns as well as what DCS perceives to be anger management needs."[5] DCS did not provide a referral for counseling, however, as Titus had announced plans of an imminent move from Nebraska to Missouri, where he would live in his mother's home. This move would require a new ICPC application, which DCS had initiated, as well as identification of services in a new state.
¶ 10 According to DCS, T.S. "did not want to be placed with her father," but also would prefer placement in a guardianship over adoption. And, as of February 2017, R.S. stated he would rather remain in Tucson with his current placement than be placed with Titus, although his first choice continued to be reunification with Ariana. Finally, DCS told the court it had recently required that all further telephone communications between Titus and the children be supervised, as the case worker had become aware of text messages to R.S. discussing the case "in [an] inappropriate context and us[ing] profanity."
¶ 11 At the permanency hearing, the juvenile court granted DCS's motion to change the case plan to severance and adoption, over the objections of both parents and the children. With respect to Titus's compliance with services, the court noted, "[He] is residing out-of-state, and seems to be doing what he can although progress is slow." Later that month, the attorney for the children informed the court of a potential conflict between them, and the court appointed new counsel for T.S.
¶ 12 DCS then filed a motion to terminate Titus's parental rights, alleging, pursuant to A.R.S. § 8-533(B)(2), that he had neglected the children by failing to protect them from Ariana's drug abuse, and also, pursuant to § 8-533(B)(8)(c), that despite "diligent effort[s]" by DCS "to provide appropriate reunification services," he had been unable to remedy the circumstances causing the children to be in an out-of-home placement for more than fifteen months and there was a *1142 substantial likelihood he would be unable to parent effectively in the near future. In July, before the termination hearing, T.S. joined R.S. in his non-licensed foster care/kinship placement.[6] R.S. had been placed there since February 2017, and the placement was willing to either adopt both children or serve as their permanent guardians.
¶ 13 At a contested termination hearing in September 2017, the juvenile court granted the termination motion on the time-in-care ground but found neglect had not been proven. As to best interests, the court stated,
Best interest is easily satisfied. These children need permanency, they need certainty, they are in an adoptive placement.... I think that severing [Titus]' s rights will help these two kids realize that they now do have permanency. I think it will open them up to the idea of adoption. At least I'm hopeful that it will.
After announcing its ruling, the court ordered DCS "to make good faith efforts to figure out a permanent plan for these children, either adoption or guardianship," and it granted "all parties leave to file a guardianship motion if that is appropriate."
¶ 14 This appeal followed. We have jurisdiction pursuant to article VI, § 9 of the Arizona Constitution and A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).
Discussion
¶ 15 To terminate parental rights, a juvenile court must find, by clear and convincing evidence, at least one of the statutory grounds enumerated in § 8-533(B) and, by a preponderance of evidence, that termination will serve a child's best interests. See A.R.S. §§ 8-533(B), 8-537(B) ; Kent K. v. Bobby M. , 210 Ariz. 279, ¶ 41, 110 P.3d 1013 (2005). We view the evidence in the light most favorable to upholding the court's order. Denise R. v. Ariz. Dep't of Econ. Sec. , 221 Ariz. 92, ¶ 10, 210 P.3d 1263 (App. 2009). We will reverse a termination order only for an abuse of discretion or clearly erroneous findings of fact, Mary Lou C. v. Ariz. Dep't of Econ. Sec. , 207 Ariz. 43, ¶ 8, 83 P.3d 43 (App. 2004), or upon a determination that, as a matter of law, no reasonable fact-finder could have found the evidence satisfied the applicable burden of proof, Denise R. , 221 Ariz. 92, ¶¶ 9-10, 210 P.3d 1263.
Termination Pursuant to § 8-533(B)(8)(c)
¶ 16 In his opening brief, Titus challenged the juvenile court's ruling with respect to this ground, as well as its finding of best interests. At oral argument in this court, however, he conceded that a reversal on the time-in-care ground would require us to reweigh the evidence, which we will not do. See Ariz. Dep't of Econ. Sec. v. Oscar O. , 209 Ariz. 332, ¶ 14, 100 P.3d 943 (App. 2004). Accordingly, we will consider the court's ruling on this ground, and the evidence on which it rests, only in the context of the court's determination that severance is in the children's best interests.
Best Interests
¶ 17 In In re Maricopa County Juvenile Action No. JS-500274 , 167 Ariz. 1, 5, 804 P.2d 730, 734 (1990), our supreme court explained the "fundamental constitutional rights involved in severance cases.... can be overridden only by the combined elements of statutorily defined improper behavior by the parent and the child's best interests." In addition, "a determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." Id.
¶ 18 In that case, a mother had sought termination of a father's rights to the couple's three-and-a-half-year-old son on the ground of abandonment "so she could name her parents in her will as guardians.... [and because,] in case she married, she wanted her future husband to be able to adopt" the child. Id. at 3, 804 P.2d at 732. The court reversed the termination order, concluding these asserted benefits were "too speculative" to support a finding of best interests, as they did not confer "any present benefit" to the child as a result of terminating his parental *1143 rights.[7] Id. at 7, 804 P.2d at 736. As examples of "affirmative benefit[s]" in support of termination, the court suggested a "petitioner might prove that there is a current adoptive plan for the child or that the child will be freed from an abusive parent," adding, "This reasoning reflects an unspoken assumption that a parent, even an inadequate one, is better than no parent at all unless the child can somehow benefit from losing his natural parent." Id. at 6, 804 P.2d at 735.
Adoptive Placement and Adoptability
¶ 19 "It is well established in state-initiated cases that the child's prospective adoption is a benefit that can support a best-interests finding." Demetrius L. v. Joshlynn F. , 239 Ariz. 1, ¶ 16, 365 P.3d 353 (2016). For example, in In re Maricopa County Juvenile Action No. JS-501904 , the court stated that DCS "need not show that it has a specific adoption plan before terminating a parent's rights," but must "show that the children are adoptable." 180 Ariz. 348, 352, 884 P.2d 234 (App. 1994), citing In re Yavapai Cty. Juv. Action No. J-9956 , 169 Ariz. 178, 818 P.2d 163 (App. 1991)and In re Maricopa Cty. Juv. Action No. JS-6520, 157 Ariz. 238, 756 P.2d 335 (App. 1988). And, in reliance on that statement, we have said the best-interests requirement may be met by proof "that the child is adoptable." Mary Lou C. , 207 Ariz. 43, ¶ 19, 83 P.3d 43. But, before Demetrius L. , courts had little guidance about what "adoptable" means and, when offered abruptly as the sole basis for a best-interests determination, it may sweep too broadly. See, e.g. , Alma S. v. Dep't of Child Safety , 778 Ariz. Adv. Rep. 24, ¶ 35 (Ct. App. Nov. 14, 2017) (suggesting, in best-interests context, "[a]doptability ... is not on its own sufficient to overcome a parent's constitutional rights"). If "adoptable" merely means that someone, somewhere, would be willing to adopt the child, then all children, given their unique dignity as human beings, and the unbounded capacity of some adults to accept and love any child, may be said to be "adoptable." If theoretical adoptability is sufficient to establish best interests, the inquiry becomes perfunctory.
¶ 20 Maricopa County No. JS-6520 was the first reported Arizona case to use the term "adoptable," but it used it in a negative context, reversing termination of a father's rights to his twelve-year-old son and eleven-year-old daughter who were "at best, questionable candidates for adoption." 157 Ariz. at 244, 246, 756 P.2d at 341, 343 (stating children had "adjusted to long term foster care" and their chances for adoption were "described as 'slim' "). Noting the enacted purpose of time-in-care provisions was to "free children for adoption," the court stated the children were neither "young" nor "adoptable," and it concluded "the provision[s] should [not] be used to allow a court, knowing full well that the child was unadoptable, to sever the parent-child relationship."[8] Id. at 243-44, 756 P.2d at 340-42.
¶ 21 Similarly, in Yavapai County Juvenile Action No. J-9956 , the court did not suggest evidence of adoptability provided a sufficient basis for a best-interests determination. 169 Ariz. at 180, 818 P.2d at 165. Rather, citing Maricopa County No. JS-6520, the court stated, "As a threshold matter," when time-in-care grounds are alleged, "there must be evidence on the record that the children are adoptable" in order to terminate parental rights. Id. (emphasis added).
¶ 22 Thus, while courts have often referred to a child's "adoptability" or her "adoptive placement" in determining best interests, we conclude those findings, to be meaningful, must reflect a finding that adoption is not only possible, but likely. As our supreme court recently stated, "When a current placement meets the child's needs and the child's prospective adoption is otherwise *1144 legally possible and likely , a juvenile court may find that termination of parental rights, so as to permit adoption, is in the child's best interests." Demetrius L. , 239 Ariz. 1, ¶ 12, 365 P.3d 353 (emphasis added); see also In re Pima Cty. Juv. Action No. S-2460 , 162 Ariz. 156, 158, 781 P.2d 634, 636 (App. 1989) (noting "[t]he immediate availability of an adoptive placement obviously weighs in favor of severance, while the improbability of adoption, absent other factors, weighs against it"). Here, evidence of the children's persistent opposition to adoption renders it more improbable than likely.
¶ 23 DCS has argued consideration of the children's positions with respect to adoption is not required, because "it is not necessary for all of the prerequisites of an adoption petition to be satisfied at the time of termination." And we appreciate that, although the children's consent would be statutorily required for an adoption, A.R.S. § 8-106(A)(3), it is not statutorily required for termination of their father's parental rights, see § 8-533. We also agree with DCS that the benefit of a prospective adoption, for purposes of a best-interests inquiry, cannot depend on a "guarantee" that the adoption will occur, as prospective parents, as well as children, might have a change of heart.
¶ 24 In this unusual case, the juvenile court's findings in support of its best-interests determination were limited to the children's being "in an adoptive placement" and the court's hope that they will recognize the "permanency" of that home and will no longer withhold their consent to adoption. Our legislature has, however, determined that the consent of T.S. and R.S. is required for an adoption, and they have consistently stated their intent to withhold that consent with respect to any adoption proceeding. Although the court was "hopeful" that they would change their minds, in light of the children's ages and their apparent resolve, we conclude the evidence was insufficient for the court to find their adoption is "legally possible and likely," Demetrius L. , 239 Ariz. 1, ¶ 12, 365 P.3d 353, and was thus insufficient to establish the "present benefit" required to support a determination of best interests, Maricopa Cty. No. JS-500274 , 167 Ariz. at 6-7, 804 P.2d at 735-36.
Permanency
¶ 25 At oral argument, DCS suggested this court should assume, for the purpose of argument, that the children continued to prefer guardianship over adoption after Titus's rights were severed. But DCS maintained termination nonetheless benefitted the children by "freeing" them for adoption, and permanency, in the event they change their minds. While Titus argues a permanent guardianship also provides permanency for the children, DCS contends it is "not as permanent" as adoption.[9] According to DCS, were Titus's parental rights not terminated, he could later seek revocation of a guardianship pursuant to A.R.S. § 8-873.[10]
*1145 ¶ 26 Titus, on the other hand, argues the provisions of § 8-873 are sufficiently protective of the children's best interests to avoid any ill-advised revocation of a permanent guardianship, which appears to be the permanent plan. For example, the statute requires appointment of a guardian ad litem; proof, by clear and convincing evidence, of a "significant change of circumstances" that might relate to the parent's ability, or the guardian's inability, to care for the children; and consideration of the children's position if they are over the age of twelve. § 8-873(A)-(C). In a revocation proceeding, the juvenile court shall also consider "[a]ny other relevant factor," § 8-873(C)(3), which, in this case, might include Titus's testimony that, although he opposed termination, he would defer to the children's wishes and acquiesce in a guardianship. Cf. Hrudka v. Hrudka , 186 Ariz. 84, 92, 919 P.2d 179, 187 (App. 1995) (under doctrine of judicial estoppel, "a party who successfully asserts a particular position in one judicial proceeding will not be allowed to assert an inconsistent position in a subsequent proceeding"), superseded by statute on other grounds as recognized in Myrick v. Maloney , 235 Ariz. 491, ¶ 8, 333 P.3d 818 (App. 2014).
¶ 27 At the termination hearing, Titus testified that he understood the children wanted to stay in Tucson, because "that's what they're familiar with," he "want[s] what's best for them," and he "wouldn't want to just uproot" them, "especially after everything they've been in." He said he would not be opposed to a guardianship, stating, "[I]t seems like that's kind of what the kids want. Doesn't sound like they want to be adopted, but, from what I gathered, that's the direction they're leaning." But Titus opposed severance, stating,
I'd like to leave some kind of open area.... So at some point, say, down the road, you know, maybe a year, maybe two or three years from now, they decide, one of them decides they want to come out and stay with me, or something like that, it would be nice for them to have that option. And definitely I want to be able to remain in contact with them.[11]
¶ 28 DCS has not disputed Titus's assertion that the permanent plan for the children is a permanent guardianship, rather than adoption. Rather, it emphasizes that, should the children later choose to be adopted, severance renders them immediately available to adoptive parents. Conversely, Titus argues termination is not presently required because, should the children later decide in favor of adoption, another termination proceeding could be initiated. See § 8-533(A) (any person having a "legitimate interest in the welfare of a child ... may file a petition for the termination" of parental rights). Further, he asserts that, in contrast to the children's position with respect to a permanent plan, which may change, termination of his parental rights, once ordered, is irrevocable. Noting that, like the parent in Maricopa County No. JS-6520 , the only statutory ground found was time-in-care, § 8-533(B)(8)(c), he contends "terminating [his] parental rights as a precursor to guardianship serves only to divest the children of available family resources should there be a significant change in their circumstances."
¶ 29 To a large extent, the assertions of both parties are correct. As DCS contends, termination frees the children to subsequently change their minds about adoption without impediment. But there is no question it also permanently severs their relationship to their biological father. "Severance of these rights is a permanent deprivation, not only on the right to custody but to all contact." In re Maricopa Cty. Juv. Action No. JS-6831 , 155 Ariz. 556, 559, 748 P.2d 785, 788 (App. 1988). We have said that "[t]he combined effect of the fundamental character of a parent's right to his child and the severity and permanence of termination dictates that the court sever the parent-child relationship only in the most extraordinary circumstances, when all other efforts to preserve the relationship have failed." Mary Ellen C. v. Ariz. Dep't of Econ. Sec. , 193 Ariz. 185, ¶ 32, 971 P.2d 1046 (App. 1999), quoting *1146 In re Maricopa Cty. Juv. Action No. JA 33794 , 171 Ariz. 90, 91-92, 828 P.2d 1231, 1232-33. In these circumstances, where there is no evidentiary basis to suggest adoption is likely, we conclude the severe and permanent consequence of termination is unwarranted.
No Other Benefit or Detriment Found
¶ 30 In concluding the juvenile court's termination order must be reversed, we again emphasize that we are influenced by the specific circumstances in this case, including the court's reliance on prospective adoption alone, without any finding of an additional benefit from severance or a detriment to the children from continuation of the relationship. Moreover, at oral argument, DCS conceded there was no "direct evidence" of such a detriment, and we agree with Titus that the case worker's somewhat general description of Titus's "concerning behaviors" is insufficient to support such a finding. Cf. Alma S. , 778 Ariz. Adv. Rep. 24, ¶¶ 19-20 (case worker's testimony lacked expert witness foundation; found "not sufficient to defeat fundamental constitutional rights").
¶ 31 Quoting Maricopa County No. JS-6831 , 155 Ariz. at 559, 748 P.2d at 788, DCS asserts, " 'In most cases, the presence of a statutory ground [for termination] will have a negative effect on the children,' and thus will warrant a finding that preserving the parent-child relationship would be detrimental." However, in Maricopa County No. JS-500274 , our supreme court rejected the suggestion that "the mere fact of abandonment could be considered sufficient to prove unfitness"; it instead concluded a separate "finding of best interest is always necessary," based on evidence "as to how or why it would be in [a child's] best interests to lose his father." 167 Ariz. at 5, 7, 804 P.2d at 734-36. We appreciate that the same evidence that proves a statutory ground may sometimes provide a basis for a best-interests finding, such as evidence that, as a result of termination, "the child will be freed from an abusive parent." Id. at 6, 804 P.2d at 735. But, as this court recognized in Maricopa County No. JS-6831 , "in some cases, this will not be true." 155 Ariz. at 559, 748 P.2d at 788.
¶ 32 To the extent Maricopa County No. JS-6831 involved similar facts, we find it instructive. In that case, a mother who lived in Illinois was found to have abandoned her two daughters, ages twelve and nine, who had been living with the twelve-year-old's father and his wife for over three years. 155 Ariz. at 557, 559, 748 P.2d at 786, 788. After awarding custody to the Arizona couple, the lower court found the ground of abandonment had been established, but it declined to find termination would be in the girls' best interests and, on that basis, denied severance. Id. at 557, 748 P.2d at 786.
¶ 33 This court affirmed, noting that, although evidence had been presented that the mother "had only limited and sporadic contact" with her daughters, "there was also evidence that there were extenuating circumstances which prevented [her] from retrieving her children." Id. at 559, 748 P.2d at 788. The court emphasized that the party seeking termination bears the burden of establishing best interests. Id. Considering a doctor's expert testimony that the girls would suffer "stress" if separated, the court concluded "[t]he 'stress' hypothesized by [the doctor] ... was not attributed to continuing contact with [the mother] but rather to the prospective relocation of [the younger daughter] to Illinois to live with her mother." Id. The court noted evidence that the children "had built a strong social and familial network in Arizona," but it wrote, "from the finding that the girls should live together and in Arizona ... it does not necessarily follow that the rights of [their mother] should be terminated." Id.
¶ 34 Similarly, here, the juvenile court did not find any detriment from the children continuing their long-distance relationship with Titus, and there appears to be no "present benefit" to terminating his parental rights "just in case " the children change their minds about adoption, Maricopa Cty. No. JS-500274 , 167 Ariz. at 7, 804 P.2d at 736, when the permanent plan for them is a permanent guardianship. This record does not support a finding that the children's prospect for adoption is "otherwise legally possible and likely," Demetrius L. , 239 Ariz. 1, ¶ 12, 365 P.3d 353, and the court's finding, contingent on its "hope[ ]" that the children will change their positions, is a "mere speculative *1147 potential benefit that might or might not materialize sometime in the future." Maricopa Cty. No. JS-500274 , 167 Ariz. at 7, 804 P.2d at 736. The finding is therefore insufficient to support the court's determination of best interests. See id.
Disposition
¶ 35 For the foregoing reasons, we reverse the juvenile court's order terminating Titus's parental rights.

According to Titus, he "ruptured a disk in [his] back, in the L-4 vertebra[ ]. And then the L-3 above and the L-5 below are both bulging, due to the injury [he] sustained."

Interstate Compact on the Placement of Children. See A.R.S. § 8-548.

Section 8-106(A)(3), A.R.S., provides that a court "shall not grant an adoption of a child unless consent to adopt has been obtained and filed with the court from.... [a] child who is twelve years of age or older and who gives consent in open court."

Tetrahydrocannabinol.

The psychological evaluation report was not admitted as evidence and is not part of the juvenile court record.

The children are placed with the parents of one of R.S.'s friends.

The supreme court assumed the court's finding of the statutory ground of abandonment was reasonably supported by the record, as that determination was not challenged on review. Maricopa Cty. No. JS-500274 , 167 Ariz. at 4, 804 P.2d at 733.

The enacting legislation provides, "The purpose of this act is to expedite the adoption of numerous children who remain in temporary foster care ... with no hope of being returned to their natural parents and, in so doing, promote a stable and long-term family environment for these children." 1986 Ariz. Sess. Laws, ch. 205, § 1.

The parties have not cited any authority defining "permanency." We note, however, that a juvenile court is required, at a "permanency hearing," to determine "[w]hether termination of parental rights, adoption, permanent guardianship pursuant to § 8-872 or some other permanent legal status is the most appropriate plan for the child." A.R.S. § 8-862(B)(1). Thus, both adoption and permanent guardianship appear to provide a "permanent legal status." Id. ; see also Jennifer B. v. Ariz. Dep't of Econ. Sec. , 189 Ariz. 553, 555-56, 944 P.2d 68, 70-71 (App. 1997) (legislative history of permanent guardianship statute indicates purpose "to provide 'permanency in the custodial relationship' of 'older children who are not suitable candidates for adoption' "), quoting H. Judiciary Comm. Minutes for H.B. 2062, 41st Leg., 2d Reg. Sess., at 2 (Ariz. Feb. 3, 1994).

Despite the juvenile court's repeated invitations to the parties to file a motion for permanent guardianship, it never ordered that one be filed, and none was pending at the time of termination. Ordinarily, we would not consider alternative permanency resolutions that were not before the court. Cf. Ariz. Dep't of Econ. Sec. v. Stanford , 234 Ariz. 477, ¶¶ 10-13, 323 P.3d 760 (App. 2014) (juvenile court lacked authority to move sua sponte to establish permanent guardianship). We nonetheless conclude that potential resolution by guardianship is appropriately considered here because we agree with Titus that, at the time of severance, the permanency plan for the children appears to have been a permanent guardianship rather than adoption. See A.R.S. § 8-871(A) (court may establish permanent guardianship of dependent child in DCS custody if in the child's best interests, further reunification efforts would be unproductive, and "[t]he likelihood that the child would be adopted is remote or termination of parental rights would not be in the child's best interests").

Under Arizona's guardianship provisions, Titus's rights and responsibilities in a permanent guardianship would be limited to those set forth in the guardianship decree. A.R.S. § 8-871(D).