NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

CLIFFORD C.,
*Appellant*,

v.

DEPARTMENT OF CHILD SAFETY, B.H.,
*Appellees*.

No. 1 CA-JV 21-0163
FILED 2-1-2022

Appeal from the Superior Court in Maricopa County
No. JD532493
The Honorable David King Udall, Judge *Retired*

**REVERSED AND REMANDED**

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Dawn Rachelle Williams
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Paul J. McMurdie joined.

---

**W E I N Z W E I G**, Judge:

¶1             Clifford C. ("Father") appeals the termination of his parental rights to a minor child.   For the following reasons, we reverse the termination order and remand for proceedings consistent with this decision.

## FACTS AND PROCEDURAL BACKGROUND

¶2             Father and Mother are the natural parents of a minor child, born in August 2018.  The couple lived together as nomads for "about [one] year," staying on the streets, in hotels and a VA-subsidized apartment. After becoming pregnant in late 2017, Mother left Father and moved to a homeless shelter.  Father lost track of Mother, but he continued to search for her.   He also sought "legal advice on how to proceed to establish paternity," and placed his name on Arizona's putative father registry. Unbeknownst to Father, Mother had promised Andy and Hayley Rauscher they could adopt the child.  The Rauschers had covered Mother's living expenses in the final trimester of pregnancy.

¶3             After months of searching, Father found Mother at a Phoenix hospital on August 17, 2018, arriving just minutes before she delivered the child.   Father briefly saw Mother, but returned the next day to "get paternity done," aware his name would not otherwise appear on the birth certificate.  By then, however, Mother had signed a written consent for Mr. and Mrs. Rauscher to adopt the child, granting them power of attorney and relinquishing her parental rights.  And so, on August 18, the child was released from the hospital to the Rauschers.

¶4             Thirteen days later, Father sued Mother for paternity, legal decision-making and parenting time.  He was unaware of the adoption. Soon after, Mother was declared incompetent.

¶5             Eight months after the birth, on April 30, 2019, the Rauschers filed a private dependency petition in the superior court to "finalize the adoption," asserting "[i]t is in the best interests of the minor child to find

that the child is depend[e]nt upon [the Rauschers, who] are the only parents that the child has known, and as such, the child is bonded to them." The Rauschers described themselves as the child's "Psychological Father," "Psychological Mother" and "Prospective Adoptive Parents." The couple provided no contact information for Mother or Father but acknowledged Father's paternity action. They argued, however, that Father was "unable to parent the child due to a history of chronic abuse of danger[ous] drugs, controlled substances and alcohol," plus he was homeless.

¶6         Four days later, Father filed a hand-written "request to the court" in the dependency action, "asking the court to have a paternity test done for me and [the child], to determine if I'm the father. This way I can stop the adoption process and get custody of [the child], if he's my son. Thank you, and b bless [sic]." The court set an initial dependency hearing for May 8, directing DCS "to conduct an investigation regarding the allegations of this petition."

¶7         Before the hearing, DCS interviewed Father. He described his relationship with Mother and his efforts to reunite with the child. He explained he was a veteran, was employed as a housekeeper at the Veteran's Administration ("VA") and was living with a friend but "working with the VA to get stable housing." He said he "hardly ever drinks," and "denies any history of drug use" aside from marijuana, which he uses without a prescription for "mood swings and PTSD." He told DCS "marijuana wouldn't be hard to let go," however, "if he gets his son." Summarizing the interview, DCS concluded that Father "is not prepared for the child as he does not have any necessary supplies to care for a child at this time," and "is a first time father and has no knowledge of child development or how to care for an infant."

¶8         DCS also interviewed Mother and the Rauschers. Mother "appeared to not have a concept of time," and "appeared to not understand the nature of certain questions." Meanwhile, the Rauschers were "aware that mother does not have the mental capacity at this time to care for the child," but "stated that mother had two psychological evaluations at the hospital and both found that she was competent and understanding of the adoption process."

¶9         A day before the hearing, DCS reported to the court and offered some preliminary conclusions:

> [Father] has diminished behavioral, cognitive, and emotional
> protective caregiver capacities. [He] does not have a history

3

of protecting the child because he was unable to protect the child due to [Mother]'s decision making. [He] has not demonstrated impulse control as he is smoking marijuana as a way to control his mood swings and [PTSD]. [He] has not demonstrated that he has adequate skills to fulfill caregiving responsibility due to his lack of knowledge of child development and limited parenting experience. In addition, [he] does not meet his emotional needs as demonstrated by him smoking marijuana in order to maintain his PTSD.

** ** **

Mr. and Mrs. Rauscher have been [the child's] primary caretakers since he was born. At this time, it is consistent with the Department's preferences until paternity and the case plan has been established.

¶10     At the May 8 hearing, DCS joined the private dependency action and secured custody of the child. The court affirmed the dependency and ordered that "the child remain in the physical placement of the current placement," the Rauschers. Father was present for the hearing and an earlier team decision meeting.

¶11     Soon after, Father established paternity and the court ordered him to participate in drug testing, parent-aide services, and supervised parenting time "at a minimum of two hours, two times per week." The court also ordered random drug tests because Father tested positive for methamphetamine and marijuana. After a few months, however, DCS decided the drug tests were unnecessary because Father had consistently tested negative.

*June 2019 – February 2020*

¶12     DCS reported on Father's progress in August 2019 and January 2020, noting his determination "to provide for his child." Father secured housing on June 1, which he maintained for the entire dependency action, along with full-time employment as a janitor at the VA hospital. He was "consistent with visitation dates and times," "prepared at all visits with food, formula, diapers and toys," and "show[ed] concern for his child." He also "closed out of case aide visitation successfully" and was meeting the "conditions for return." But DCS still had "some concerns" about Father's mental health, stemming from a supervised visit in late August when Father "became upset about his child crying," "told [him] to shut up" and "spanked him out of frustration." The visit was ended. Nobody saw the

incident, but a parent aide inside the room believed Father had only "cuss[ed] about" the Rauschers. DCS recognized a similar tension, commending Father: "Despite his disagreement with where his child is placed[,] he continues to participate in services and has started to be able to develop a bond with his child."

¶13        Father became frustrated with parent-aide services. He was assigned three aides in four months because the first resigned, the second continually canceled visits, and the third disagreed about what happened during the August 2019 visit. He "lost trust" in parent-aide services and "was not receptive to the parent aide's suggestions." The referral closed out in January 2020. DCS acknowledged the complications had "delayed [Father's] progress in enhancing his parental capacities."

¶14        When parent-aide services restarted in late February, DCS reported that the first visit "went well and [Father] was prepared with toys and snacks for [the child]." DCS questioned Father's basic parenting skills, such as changing diapers, but concluded that he was "actively engaged in services and ha[d] been demonstrating some enhanced protective capacities."

¶15        DCS asked Father to undergo a psychological evaluation. A clinical psychologist, Dr. Joseph Bluth, examined Father in September 2019, about 17-18 months before the termination hearing. Dr. Bluth described Father as "pleasant" and "congenial" with fair "insight and judgment." He noted that Father had been diagnosed with PTSD from his combat in Desert Storm, which "could affect his ability [to] provide a safe and effective home for the child, as he could be distracted by his mental health symptoms at times." He recommended that Father continue with his counseling treatment and parent-skills training.

¶16        DCS also asked Father to undergo a bonding and best-interests assessment. A licensed psychologist, Dr. Al Silberman, performed the assessment in February 2020, over a year before the termination hearing. After observing Father and child for 20 minutes, Dr. Silberman reported that Father "loves his child and has made good progress," "appears [to have] made a great deal of effort in bettering himself," "seemed to respond to his child appropriately," "was aware of the child's needs even though the child is only beginning to verbalize" and "seem[s] to have an adequate understanding of his son." Dr. Silberman concluded: "At this point, it appears that the foster parents are more able to meet the child's needs. However, if the father continues with his stability, then he might also be appropriate," adding that "[m]ore time is needed to see if the father can

continue with the improvements he has made, including his emotional and financial stability."

*March 2020 – July 2020*

**¶17**        COVID-19 arrived in March 2020, and Father transitioned to virtual visits, which went "poorly" because neither Father nor the child adapted to the new format.  The child cried "inconsolably," and Father missed visits or did not engage.  But DCS reported that visitation "improved over time," and parent aides described how Father read to the child and encouraged him to talk.

**¶18**        DCS resumed in-person visits in May 2020.  Father "was observed to be cleaning up the apartment" and he "provided appropriate toys and snacks" to the child.  But Father continued to clash with the parent aides.  At one point, Father became "agitated" with a parent aide who offered advice about getting the child to nap, and "a very large argument" broke out.  Father ended the visit early and canceled a follow-up skills session.  By June 2020, Father again refused to work with parent-aide services and the second referral was closed.

**¶19**        DCS next referred Father to therapeutic visitation so he could develop a bond with the child.  The visits were virtual.  The therapist reported that Father demonstrated "healthy parenting skills" after two visits, but Father "did not exhibit a compliant approach and was defensive" after the third visit.  The therapist recommended that in-home visits would be safer and more effective than virtual or in-office visits.  Father requested a third parent-aide referral.  DCS declined, citing Father's disagreements with prior aides.

*August 2020 – January 2021*

**¶20**        Father continued to have supervised in-person visitation through 2020.  DCS reported that Father had trouble with diaper changes and fed the child "Cheetos and apple juice at every visit," remarking that he "does not seem to understand appropriate nutrition for a child [his] age."  DCS expressed concern about Father's lack of progress in basic parenting skills.

**¶21**        Father worked to resolve the concerns.  Around July or August 2020, he independently sought parenting classes and counseling through outside organizations.  At the hearing, Father testified he had obtained "well over 20 certificates" from attending various parenting courses.  He described learning about stages of childhood, age-appropriate

behaviors and building self-esteem through praise, and how he put these lessons into practice with the child. Black Child and Family Services told DCS that Father was working to improve his protective capacities. Moreover, Father independently began counseling in early 2021, which continued through the April severance hearing.

¶22        By November 2020, Father requested that visits be increased from two to four hours so he would have more time with the child. DCS reported that Father "seems to do well with interacting with Baby Boy in small lengths of time" but it was "unknown" how longer visits would go. Yet, in January 2021, a case aide reported that a four-hour visit "went well." And that month, Father provided many foods beyond Cheetos and juice, including cereal, peanut butter and jelly sandwiches, chicken nuggets, crackers, cheese and pizza bites. Father kept the child occupied with an assortment of child-friendly activities.

*Severance Hearing and Order*

¶23        The juvenile court held a two-day severance hearing in February and April 2021. It heard testimony from Father, a DCS Specialist, Dr. Bluth and Dr. Silberman. Seventeen months had elapsed since Dr. Bluth examined Father. Twelve months had elapsed since Dr. Silberman examined Father. Dr. Bluth agreed it would have helped to receive more records and information "because [his evaluation of Father] was done at the beginning of the case." The DCS Specialist testified that Father had not shown he could parent the child. She was troubled that Father took nearly two years to understand where he needed to improve. She believed Father was "not truly absorbing the information," and that he was "reluctant to engage" with services. She also raised concern about the poor relationship between Father and service providers.

¶24        After the hearing, the court terminated Father's parental rights to the child based on 15-months out-of-home placement. A.R.S. § 8-533(B)(8)(c). The court generally found that Father (1) "has been unable to remedy the circumstances that cause the child to be in an out-of-home placement," and (2) "[t]here is a substantial likelihood that [he] will not be capable of exercising proper and effective parental care and control in the near future." The court reasoned that termination was in the child's best interests because the Rauschers had a "significant relationship" with the child, and adoption by placement would provide permanency and stability.

¶25        DCS drafted a proposed termination order, which the court signed. The order listed "concerns" about Father's parenting skills and

mental health, including that "Father failed to understand appropriate food and snack and proper nutrition for the child as he almost always gave Cheetos and juice at visits," and Father still brought the wrong size diapers. The order emphasized as "extremely concerning" that Father "alleges he is finally understanding the parenting skills being taught to him after receiving services for almost two years." On mental health, the order generally mentioned "concerns about father's mental health stability and ability to control his impulses regarding his anger."

**¶26** Father timely appealed. We have jurisdiction. A.R.S. §§ 8-235(A), 12-120.21, and 12- 2101(A)(1).

## DISCUSSION

**¶27** To terminate parental rights, the superior court must find clear and convincing evidence of a statutory ground for severance under A.R.S. § 8-533(B), and that termination is in the child's best interests. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000). "When the statutory grounds for termination are challenged, we will affirm a termination order unless we must say as a matter of law that no one could reasonably find the evidence supporting statutory grounds for termination to be clear and convincing." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (cleaned up). To meet the standard for clear and convincing evidence, the court must find the grounds for termination are "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284-85, ¶ 25 (2005).

**¶28** The court terminated Father's parental rights based on 15 months in an out-of-home placement under A.R.S. § 8-533(B)(8)(c), which required DCS to provide clear and convincing evidence that (1) the child had been in an out-of-home placement for at least 15 months, (2) "the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement," and (3) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). DCS also needed to prove it made diligent efforts to reunify the family. *Id.*

**¶29** On this record, we hold "that no one could reasonably find the evidence supporting statutory grounds for termination to be clear and convincing" under A.R.S. § 8-533(B)(8)(c). *See Jordan C.*, 223 Ariz. at 93, ¶ 18. DCS does not and cannot dispute that Father has addressed all but two of its initial concerns. The record is uncontested that Father has maintained stable housing and full-time employment since June 2019. DCS is not

concerned about substance abuse. By the termination hearing, DCS challenged only Father's parenting skills and mental health.

*Parenting Skills*

**¶30**       The court found that Father lacked parenting skills "as evidenced by the lack of proper nutrition, ongoing issues with nap time and diaper changes." But this evidence does not prove parental unfitness or justify termination of parental rights. *See Appeal of Maricopa Cnty. Juv. Action No. JS-6520,* 157 Ariz. 238, 254 (App. 1988) ("[T]he parents' inability to care for the child must show a danger to the child's welfare."). And the record shows Father was always prepared for visits and offered basic care. By January 2021, case aides reported the visits "went well," Father engaged the child with toys and books, his apartment was "very clean and in order," and he brought cheese and crackers, juice, peanut butter and jelly sandwiches, pizza bites and bananas—all evidence that Father was becoming a minimally adequate parent. DCS even noted Father's improvement with changing diapers.

**¶31**       Beyond that, the record has no evidence—much less clear and convincing evidence—that Father is unfit to parent. *See Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 9 (2018) ("We now explicitly reiterate that conclusion, which ensures compliance with the due process requirement that a court find, by clear and convincing evidence, parental unfitness when a severance is contested."). Just the opposite. It shows Father's robust, proactive and determined attempts to form a legal and emotional bond with his child—he searched for Mother during the pregnancy, placed his name on the putative father registry, sought "legal advice on how to proceed to establish paternity," immediately moved to establish paternity in the superior court, contested the dependency petition and more. The record shows that Father strived to improve, even when frustrated with parent-aide services, taking parenting classes from the Family Involvement Center and Parenting Arizona, and independently obtaining counseling from Black Family Child Services. *See Roberto F. v. Ariz. Dep't of Econ. Sec*, 232 Ariz. 45, 57-58, ¶¶ 58-60 (App. 2013) (relying on a father's "significant progress" in obtaining employment, housing, and sobriety, and his "considerable efforts to provide for the needs of his [c]hildren").

*Mental Health Concerns*

**¶32**       The record does not contain clear and convincing evidence that Father has been unable to remedy mental health issues, or establish a

substantial likelihood that he will be incapable of exercising proper and effective parental care and control in the near future.

**¶33**        Two mental health experts testified at the termination hearing. And neither opined that Father's parental rights should be terminated. Neither expert concluded or testified that Father could not "remedy the circumstances" that caused the child's removal, or that Father would remain incapable "of exercising proper and effective care and control in the near future." They instead offered general, equivocal observations—likely because they had stale information. Seventeen months had elapsed since Dr. Bluth examined Father. Twelve months had elapsed since Dr. Silberman examined Father. DCS had not provided either expert with updated records or information. Dr. Bluth conceded this disadvantage, acknowledging "it would [have] help[ed] to get other information" because he had evaluated Father "at the beginning of the case, and there may be more information over time that could help to delineate further diagnoses or problems that the individual may be experiencing."

**¶34**        Moreover, aside from one disputed incident, which happened over 20 months before the severance hearing, DCS complained only about the relationship between Father and unnamed service providers, asserting that Father is "easily frustrated and verbally aggressive with service providers." On this record, DCS did not prove that Father was a danger to the child's welfare. *See No. JS-6520,* 157 Ariz. at 245.

## CONCLUSION

**¶35**        We reverse the termination order and remand for dependency proceedings to continue.

